# ROBERT J. DiGRAZIA v. COUNTY EXECUTIVE FOR MONTGOMERY COUNTY

[No. 123, September Term, 1979.]

*Decided September 8, 1980.*

438

*Motion for reconsideration filed October 8, 1980; denied October 10, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Peter I. J. Davis*, with whom were *Charles N. Shaffer* and *Shaffer & Davis* on the brief, for appellant.

*Richard E. Frederick, Deputy County Attorney*, with whom were *Paul A. McGuckian, County Attorney*, and *Charles S. Rand, Assistant County Attorney*, on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

We granted certiorari in this case to consider the reach of the Law Enforcement Officers' Bill of Rights, Maryland Code (1957, 1976 Repl. Vol., 1978 Cum. Supp.), Art. 27, §§ 727-734D and, more specifically, whether summary judgment was properly entered, concluding as a matter of law, that the Director of Police of Montgomery County had not been removed from his office in violation of the Act's provisions.

(1)

Section 728 of the Act (hereafter the LEOBR) provides that when a law enforcement officer "is under investigation or subjected to interrogation by a law-enforcement agency, for any reason which could lead to disciplinary action, demotion or dismissal," the investigation or interrogation shall be conducted under conditions and safeguards

specifically delineated therein.[1] These include regulation as to the time and place of the interrogation, and a provision that the law-enforcement officer under investigation be given information concerning the persons conducting the investigation and those present during an interrogation. Other safeguards specified in § 728 include the right of the officer to be informed in writing of the nature of the investigation prior to any interrogation, the right of the officer to be represented by counsel during the interrogation, to have the names of witnesses prior to any departmental hearing,[2] and to receive, prior to a hearing, a copy of the record of any interrogation (which the section requires be maintained). Another condition contained in § 728 is that no "adverse material" be inserted into the officer's file without affording him the right to review and comment on it.

Section 730 provides that if the investigation or interrogation "results in the recommendation of some action, such as demotion, dismissal, transfer, loss of pay, reassignment, or similar action which would be considered a punitive measure," notice must be given (with exceptions not here pertinent) to the officer "that he is entitled to a hearing on the issues by a hearing board."[3] Section 730 contains detailed provisions governing the conduct of the hearing and the introduction of evidence.

Section 731 (a) requires that the hearing board's decision be in writing and include findings of fact. Where the board's

---

1. Section 727 (b) defines a "Law-enforcement officer" as a person who, in his official capacity, is authorized to make arrests and who is a member of the law-enforcement agency, as thereafter listed in § 727 (b) (1) through (9). The police department of "any county" is specifically included within the definition of a law-enforcement agency.

2. A "Hearing" is defined in § 727 (d) to mean:

"any meeting in the course of an investigatory proceeding, other than an interrogation, at which no testimony is taken under oath, conducted by a hearing board for the purpose of taking or adducing testimony or receiving other evidence."

3. Section 727 (c) (1) defines "Hearing boards" to mean:

"A board which is authorized by the chief [of police] to hold a hearing on a complaint against a law-enforcement officer and which consists of not less than three members . . ., all to be appointed by the chief and selected from law-enforcement officers' within that agency . . . [thereafter specifying exceptions and some variations]."

finding is one of guilt, it is required to make a recommendation for punishment, which may include "demotion, dismissal, transfer, loss of pay, reassignment, or other similar action which would be considered a punitive measure." Section 731 (c) provides that the recommendation of the hearing board is not binding upon the chief of police, who must make the final determination.

Section 733, entitled "Retaliation for exercising rights," provides that a law-enforcement officer:

> "may not be discharged, disciplined, demoted, or denied promotion, transfer, or reassignment, or otherwise discriminated against in regard to his employment or be threatened with any such treatment, by reason of his exercise of or demand for the rights granted in this subtitle, *or by reason of the lawful exercise of his constitutional rights.*" (Emphasis added.)

Section 734 authorizes a law-enforcement officer "who is denied any right afforded by this subtitle ... [to] apply at any time prior to the commencement of the hearing before the hearing board ... to the circuit court of the circuit or the Baltimore City Court ... for an order directing the law-enforcement agency to show cause why the right should not be afforded."

(2)

Robert DiGrazia was appointed Director of the Montgomery County Police Department by former County Executive James Gleason. The appointment was confirmed by the County Council, as required by law, on October 5, 1976. The office assumed by DiGrazia was for an indefinite term and was not within the protection of the county's merit system of employment.

County Executive Gleason did not seek re-election and his term of office expired on December 4, 1978. On that date, Charles Gilchrist, having been elected as County Executive on November 7, 1978, assumed office. Three days later, on

December 7, 1978, Gilchrist asked for DiGrazia's resignation. According to comments attributed to Gilchrist at a press conference held that same day, his decision to seek DiGrazia's resignation was based on statements previously made by DiGrazia, which disparaged the county's police force, *i.e.*, that 50% of the department's officers were unqualified and that most members of the force viewed the community as the enemy. Gilchrist said he did not agree with these statements, and he believed their utterance by DiGrazia made it impossible for him to serve effectively as the director and to implement police department policy. DiGrazia's departure, Gilchrist said, would "clear the air and . . . restore sense of purpose and unity and . . . go on with police work." Gilchrist admitted at the press conference that he did not personally hear DiGrazia make the statements. He said that he had discussed the statements with DiGrazia prior to December 7, 1978, when he asked for his resignation. Had DiGrazia not been "at fault" in making the statements, Gilchrist said he "would not have taken this step."

DiGrazia refused to resign and Gilchrist forthwith relieved him of his duties. designating Major Donald Brooks, a career police officer, as Acting Director. DiGrazia was placed on leave with pay until March 1, 1979.

On December 13, 1978, DiGrazia filed a "Petition for order to show cause" in the Circuit Court for Montgomery County, pursuant to § 734 of LEOBR. He alleged that his removal was based on public comments made by or attributed to him concerning the affairs of police officers, and that his discharge constituted "punishment" without regard to, and in derogation of, LEOBR's provisions. DiGrazia claimed that he was a law-enforcement officer subjected to investigation and was therefore entitled to the protection afforded by the LEOBR. He contended that his rights under § 728 were violated because he was not informed of the officer in charge of the investigation which was made of him, nor was he informed in writing of the nature of the investigation prior to his discharge, or of the names of the witnesses against him. DiGrazia claimed that his rights under § 728 (12) were

violated because "adverse material" was inserted into his file without giving him an opportunity to see or review it, and that his dismissal violated § 730 because he was not given notice that he was entitled to a hearing before a disciplinary hearing board.

In answer to DiGrazia's petition, the County Executive claimed that the LEOBR was not applicable because DiGrazia was not subjected to an investigation or an interrogation which resulted in the recommendation of a disciplinary sanction. Consequently, it was argued that DiGrazia was not entitled to a hearing before a hearing board under § 730. Moreover, Gilchrist maintained that DiGrazia was not a "law-enforcement officer" within the contemplation of the LEOBR, nor was the action taken by the County Executive that of a "law-enforcement agency" under the Act.

Each party moved for summary judgment on the pleadings and stipulated exhibits, which included transcripts of Gilchrist's press conference of December 7, 1978 and a later television interview in which he repeated his reasons for asking for DiGrazia's resignation. The court (Fairbanks, J.) said that the issues presented were (1) whether Gilchrist violated § 733 of the LEOBR, "which specifically proscribes the discharge or disciplining of a law-enforcement officer by reason of his lawful exercise of a constitutional right, in this instance, the right to free speech"; and (2) whether DiGrazia was a law-enforcement officer "entitled to the procedures outlined in Sections 728 (b), 730 and 731 . . . including a hearing before a departmental hearing board."

The trial court concluded that DiGrazia was neither discharged nor disciplined in violation of the safeguards of the LEOBR. It said that DiGrazia was a nonmerit system employee, with no written contract of employment, appointed to an indefinite term, and who, after December 4, 1978 (when County Executive Gleason's term of office expired) merely held his office as a holdover. The court held that DiGrazia was simply not reappointed by Gilchrist and consequently he was neither disciplined nor discharged under § 733. It said that DiGrazia had no proprietary inter-

est in the position of Director of Police and that it was therefore unnecessary to decide whether his dismissal was in retaliation for the exercise of his right to freedom of speech.

The court held that § 728 was applicable only if four prerequisites were shown: (1) that DiGrazia was a law-enforcement officer, (2) that he was under investigation or subjected to interrogation, (3) that the investigation or interrogation was being conducted by a law-enforcement agency, and (4) that the investigation or interrogation was for a reason which could lead to disciplinary action. It determined that DiGrazia was neither investigated nor interrogated, and that the County Executive was not a law-enforcement agency under the LEOBR's provisions. Finally, the court held that because the removal of DiGrazia was not punitive, the procedures pertaining to a hearing in §§ 730 and 731 were inapplicable. The court denied DiGrazia's motion for summary judgment and granted summary judgment for Gilchrist.

The judgment was affirmed on appeal. *DiGrazia v. County Exec. for Mont. Co.,* 43 Md. App. 580, 406 A.2d 660 (1979). The Court of Special Appeals stated that the LEOBR was not applicable to DiGrazia since he was a non-tenured law-enforcement officer whose employment could be terminated without cause. As a second ground for its affirmance, the court held that DiGrazia did not establish the precondition to the applicability of the statute, namely, that an investigation had been undertaken. It said that a reading of the transcripts of the press conference and the television interview did not support an inference that an investigation took place. For these reasons, the court found that DiGrazia could not invoke the protections of §§ 728, 730, 731 and 733, and that summary judgment in Gilchrist's favor was properly entered.[4]

---

4. The Court of Special Appeals also decided that "to require that the County Executive submit what is essentially a political determination to judicial review would be an encroachment by the judicial branch upon the executive branch and an invasion of the prerogative of the Executive's office." 43 Md. App. at 586.

(3)

Maryland Rule 610 d 1 provides for granting summary judgment "if the pleadings, depositions, and admission on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Among other methods, parties may place before the court facts necessary to a determination of the motion through stipulation or concession. *Washington Homes v. Inter. Land Dev.,* 281 Md. 712, 716-16, 382 A.2d 555 (1978). Of course, the purpose of the summary judgment procedure is not to determine factual disputes, but rather to determine whether there is a dispute over material facts that should be tried. *Berkey v. Delia,* 287 Md. 302, 413 A.2d 170, 171 (1980); *Peck v. Baltimore County,* 286 Md. 368, 381, 410 A.2d 7 (1979); *Honaker v. W. C. & A. N. Miller Dev. Co.,* 285 Md. 216, 231, 401 A.2d 1013 (1979). These cases also hold that in determining whether a factual dispute exists, all inferences must be resolved against the moving party, even if the underlying facts are undisputed. And disposition by summary judgment is generally inappropriate in cases involving motive or intent. *See Berkey v. Delia, supra,* 287 Md. at 306, 324-25.

There is agreement between the parties that DiGrazia was a non-tenured law-enforcement officer serving an indefinite term of office, and that after December 4, 1978, when the former County Executive's term of office expired, he was a mere holdover in the office, subject to lawful replacement at any time thereafter. The nub of DiGrazia's complaint is not that he was not reappointed, but that his removal from office constituted a summary disciplinary dismissal solely because of his alleged public statements. The action was taken, DiGrazia contends, in total disregard of the protections afforded to him by the LEOBR. He seeks reinstatement in his position, together with all the financial benefits of the office, up to the time that his permanent successor, Bernard Crooke, qualified and was confirmed by the County Council, *i.e.,* May 1, 1979.

Contrary to the view taken by the Court of Special

Appeals, we think that LEOBR's provisions are not limited to tenured law enforcement officers. Consistent with the Act's all-encompassing subtitle — "Law Enforcement Officers' Bill of Rights" — the LEOBR's protections are extended to any person defined as a law-enforcement officer in § 727 (b), unless expressly excluded under § 727 (b-1), *i.e.,* "an officer serving in a probationary status except when allegations of brutality in the execution of his duties are made" and "persons serving at the pleasure of the police commissioner of Baltimore City." Not only is there no exclusion in the LEOBR for chiefs or other heads of police departments, but the Act expressly contemplates that such persons are entitled to its benefits. § 728 (13). DiGrazia therefore is plainly within the Act's protections and covered by its provisions.

DiGrazia interprets the LEOBR as affording him a right to a hearing before a departmental disciplinary board to determine the existence of cause before he could be removed from office for disciplinary reasons — in this instance to determine whether he made the statements in question, and, if so, whether his constitutional right to freedom of speech, protected under § 733, was infringed by his summary dismissal. The rights protected by § 733 are secured, DiGrazia claims, whether or not an investigation is conducted under § 728. He maintains, however, that because Gilchrist concededly had no firsthand knowledge of whether he made the statements or not, an inference of fact arises, sufficient to defeat a summary judgment motion, that an investigation under § 728 was made to determine whether he uttered the remarks — an investigation which resulted in his dismissal.

Gilchrist maintains that summary judgment in his favor was properly entered because there is nothing in the record to show that DiGrazia was removed for disciplinary reasons in violation of § 733. DiGrazia was simply not reappointed, Gilchrist contends, Major Brooks being appointed in his place as Acting Director on December 7. Gilchrist argues that the LEOBR can only be activated by the initiation of an investigation which could lead to disciplinary action,

demotion or dismissal and that no investigation was shown to have taken place in this case. It strains common sense according to Gilchrist that he could or would have conducted a LEOBR-type investigation prior to seeking DiGrazia's resignation — a resignation to which he was entitled without assigning any reason at all. Gilchrist suggests that it would defy reason to conclude that the Legislature intended to permit a quasi-judicial board to make a determination on a matter dealing with the policymaking appointive powers of the County Executive.

### (4)

Although it was clearly within Gilchrist's power to remove DiGrazia from the office of Director of Police and replace him with another appointee, his decision to terminate DiGrazia's employment would not have been lawful if it was made because of DiGrazia's exercise of constitutionally protected first amendment rights. *Perry v. Sinderman,* 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972). In *Perry,* the Supreme Court stated:

"For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests — especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' *Speiser v. Randall,* 357 U.S. 513, 526. Such interference with constitutional rights is impermissible." *Id.* at 597.

In view of *Perry,* the fundamental issue before us is whether, in entering summary judgment for Gilchrist, the trial judge properly concluded, as a matter of law, that DiGrazia's right under § 733 not to be discharged for exercising his right of free speech was not violated.

In *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977), the Court set out the test for determining whether a public employee had been improperly discharged from his position for constitutionally protected conduct. There, a school teacher was not rehired, at least in substantial part, because he had informed a radio station that the school board had circulated a dress code for adoption by teachers. Under the test formulated by the Court, the employee has the burden to show that the questioned conduct was a substantial or motivating factor in his removal. If this burden is discharged, then the burden shifts to the employer to prove by a preponderance of the evidence that he would not have continued the employment even absent the protected activity. The issue is to be resolved in favor of the employee only if the court finds that he would have been reemployed but for the protected conduct. *See Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 416-17, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979). The Court observed:

> "The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision." 429 U.S. at 285-86.

The *Mt. Healthy* test, of course, is applicable only if the

employee establishes that his conduct was constitutionally protected. The threshold issue, therefore, is whether DiGrazia's alleged comments were constitutionally protected.

In *Pickering v. Board of Education,* 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968), the Supreme Court established a balancing test for determining when a public employee's speech is protected by the first amendment. In that case, a public school teacher was dismissed for a letter he had written to a newspaper criticizing the local Board of Education. To resolve the constitutional claim, the Court weighed the interest of the teacher, as a citizen, in commenting on matters of public concern, against the State's interest, as an employer, in providing efficient public service. Although the Court rejected the argument that public employers may condition employment on relinquishment of first amendment rights, it noted that

> "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." 391 U.S. at 568.

The determination of whether the employee's speech was constitutionally protected depended, the Court said, on both the nature of the speech and the nature of the employment relationship. In considering the former, the Court viewed such factors as whether the speech related to a matter of public concern, and whether it was accurate or false and defamatory. In considering the latter element, the Court said that an appraisal is necessary with respect to the impact of the speech on the employment relationship and on the efficiency of the public service. The relevant factors to examine include whether the speech was directed at someone with whom the speaker had a close working relationship for which it could persuasively be claimed that personal loyalty and confidence are necessary to its proper functioning, and whether the speech might disrupt discipline or harmony among co-workers. The Court decided in *Pickering* that the interests of the school board in limiting the teacher's speech

were not significantly greater than the interest in suppressing a similar communication by a member of the general public. It concluded that because the Board did not prove knowing falsity or reckless disregard for the truth within the meaning of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), Pickering's dismissal was a violation of his right to freedom of speech. Although under the facts of the case, the teacher's first amendment rights were considered no different than those of the general public, *id.* at 573, *Pickering* permits imposing different standards where the statement directly affects the ability of an employee to carry out his duties. *Id.* at 569.

We applied these constitutional principles in *Brukiewa v. Police Commissioner,* 257 Md. 36, 263 A.2d 210 (1970), a case decided prior to the LEOBR's enactment in which a member of a police department was disciplined for his public criticism of the department's reporting and patrol procedures, and for certain other statements.[5] We concluded that the officer had engaged in protected first amendment speech under *Pickering* and therefore could not be disciplined for making the statements. We held that Brukiewa's statements were not shown to be false; that his fitness to perform his duty was unimpaired by his statements; the statements were not directed at a superior officer with whom he would come into frequent contact; the statements did not affect the discipline or efficiency of the department; and they were not corrosive of the public's confidence in the department.

That the test for balancing the right of an employee to first amendment free speech protection, as set forth in *Pickering,* permits consideration of whether the employee is a policymaking, as opposed to a nonpolicymaking official, is clear from *Elrod v. Burns,* 427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S. Ct. 1287, 63 L. Ed. 2d 574 (1980). Those cases involved the practice of discharging non-tenured government employees from their positions solely for partisan political reasons;

---

**5.** He stated that the department's morale had "hit its lowest ebb, right now," and that within the next six months if the situation continued "I feel that the bottom is going to fall out of this City."

they implicated a first amendment challenge to the practice on the ground that it unconstitutionally conditioned the right of such individuals to government employment by coercing them into compromising their political beliefs, thereby imposing an unconstitutional qualification on the receipt of a public benefit. The Supreme Court differentiated between confidential, policymaking employees and nonpolicymaking employees, indicating that, in the circumstances, the former had less stringent first amendment protections than the latter. The Court concluded that, notwithstanding first amendment protections, non-tenured policymaking officials could be dismissed where it aided the political party in power to implement the policies for which it was elected. It indicated that in such circumstances the first amendment interests of policymaking officials may be outweighed by the State's vital interest in maintaining efficiency in government, where the employee's political beliefs could impair the performance of his public duties.

Whether DiGrazia was a policymaking or a nonpolicymaking official is a key factor under *Pickering* in considering his employment relationship with the County Executive and whether his public statements, if made, directly affected his ability to carry out his public duties. *See, e.g., Mitchell v. King,* 537 F.2d 385 (10th Cir. 1976), and Note, *Free Speech and Impermissible Motive in the Dismissal of Public Employees,* 89 Yale L.J. 376 (1979). *See also Besig v. Friend,* 460 F. Supp. 134 (N.D. Cal. 1978) and *Rosenberg v. Redev. Auth. of City of Philadelphia,* 428 F. Supp. 498 (E.D. Pa. 1977). DiGrazia claims that he is not a policymaking official but rather an "implementor" of police department policies established by the County Executive. While Gilchrist contends with considerable force that, as Director of Police, DiGrazia held one of the highest policymaking positions in the county government, there is some indication from Gilchrist's press conference statements that DiGrazia implements, but does not establish, police department policy.

As we have indicated, even though DiGrazia is a non-tenured law enforcement officer, he is covered by the

LEOBR to the extent of its applicable protections. We think, in the circumstances of this case, that it was error to enter summary judgment for Gilchrist, finding as a matter of law that DiGrazia had not been removed from office in violation of the protections afforded to him under the Act's provisions. In the words of *Mt. Healthy*, DiGrazia as a non-tenured official could have been removed by Gilchrist, without a hearing, "for no reason whatever," provided only that the removal was not accountable to the "exercise of constitutionally protected First Amendment freedoms." 429 U.S. at 283. Whether DiGrazia was removed from his position as a punitive measure for exercising his right of free speech — a right expressly protected by § 733 — is a mixed question of law and fact, not appropriate for resolution on summary judgment. Indeed, DiGrazia does not even admit making the statements attributed to him, and Gilchrist concedes that had DiGrazia not made the statements he might not have removed him.[6] Of course, in view of Gilchrist's press conference statements, whether DiGrazia is a policymaking official, for purposes of the *Pickering* test, is also a question of fact.[7]

The protection afforded law-enforcement officers by § 733 does not depend upon whether an investigation was conducted under § 728. The right under § 733 not to be discharged "by reason of the lawful exercise of [the officer's] constitutional rights" is separate and independent of any requirement that an investigation be conducted under § 728. The legislative scheme of the LEOBR is simply this: Any law-enforcement officer covered by the Act is entitled to its protections during any inquiry into his conduct which could lead to the imposition of a disciplinary sanction.

---

**6.** DiGrazia suggested on appeal for the first time that he was removed from his office for political reasons, presumably in violation of Elrod v. Burns, 427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S. Ct. 1287, 63 L. Ed. 2d 574 (1980). While the LEOBR provides that law-enforcement officers have "the same rights to engage in political activity as are afforded to any State employee" (§ 728 (a)), it is clear that DiGrazia's application for a show cause order under § 734 did not encompass a claim that he was removed from office for partisan political considerations.

**7.** Elrod v. Burns, *supra,* contains a discussion of the differences between policymaking and nonpolicymaking employees. 427 U.S. at 367-68.

Implicit in § 728's provision that "[w]henever a law-enforcement officer is under investigation ... by a law-enforcement agency, for any reason which could lead to disciplinary action, demotion or dismissal" is the assumption that a disciplinary-type complaint has been lodged against the officer — a complaint which, except as otherwise provided in the Act,[8] will be investigated by the officer's law-enforcement agency as a precondition to any recommendation for the imposition of a disciplinary sanction. The procedural safeguards afforded to the officer during the official inquiry into his conduct constitute the heart of the Act's protections. *See Abbott v. Administrative Hearing Board,* 33 Md. App. 681, 366 A.2d 756 (1976). If the investigation results in a recommendation that the officer be disciplined for his conduct, he is entitled to a hearing under § 730. *Moore v. Town of Fairmount Heights,* 285 Md. 578, 403 A.2d 1252 (1979). If the hearing board recommends the imposition of a disciplinary sanction, the chief of police makes the final determination whether to impose punishment.[9] If he discharges or otherwise disciplines the officer, § 732 authorizes the taking of an appeal to the court, pursuant to Maryland Rule B2 (appeals from administrative agencies).

If, prior to any hearing before a hearing board, the officer believes that his rights under the LEOBR were violated, then he may apply to the court under § 734 to require the law-enforcement agency "to show cause why the right should not be afforded." The court must then determine whether the officer's claim of denial of prehearing LEOBR rights is meritorious. One of those rights, as asserted by DiGrazia, was not to be discharged for the lawful exercise of his constitutional rights and in connection therewith to be afforded all of the Act's procedural protections pertaining to an investigation and a departmental hearing. Where, as

---

**8.** Section 734A of the LEOBR provides summary punishment for minor violations of departmental rules and regulations where the facts are undisputed and the officer waives his right to a hearing under § 730.

**9.** Where the chief of a county law enforcement agency is himself the target of the investigation, the official who may appoint the chief's successor functions as the chief of police for purposes of applying the Act's provisions. § 724 (b) (13) (iv).

here, the determination cannot properly be made as a matter of law, the entry of a summary judgment is inappropriate.

The case must, therefore, be remanded to the circuit court to determine, after an evidentiary hearing, whether in light of the principles of *Pickering* and *Mt. Healthy,* Gilchrist's decision to remove DiGrazia was implemented in violation of LEOBR's provisions, including DiGrazia's first amendment right to free speech. If the court finds in the negative, the matter is concluded against DiGrazia. If it finds that DiGrazia made the public statements attributed to him, and that there was evidence to show that Gilchrist summarily removed him as a punitive disciplinary measure in violation of LEOBR's provisions, then it would be within the court's power under § 734 to remand the matter for further proceedings so that DiGrazia's claim could be adjudicated in accordance with the procedural machinery established in the Act, including, if applicable, the right of judicial review under § 732.

Section 734B of the LEOBR provides that the Act shall supersede "any State, county or municipal law, ordinance, or regulation that conflicts with the provisions of this subtitle, and any local legislation shall be preempted by the subject and material of this subtitle." To afford the Act its legislatively intended construction does not unlawfully impair the authority of the County Executive to remove or replace a non-tenured police department official. The Act simply restricts the right of the appointing authority to discharge such an official for a reason that runs afoul of its protective provisions.

> *Judgment reversed; case remanded to the Court of Special Appeals for remand to the Circuit Court for Montgomery County with directions that the summary judgment be vacated and further proceedings conducted consistent with this opinion; costs to abide the result.*