708 A.2d 34

**Julie V. WELLS, et al.,**

v.

**David M. POLLAND, et al.**

**No. 1228, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

April 7, 1998.

700

Daniel L. Shea (Brault, Graham, Scott & Brault, LLC, on the brief), Rockville, for appellants.

Mary Platt Cooper (Amy Leete Leone and McCarthy, Wilson & Ethridge, on the brief), Rockville, for appellee Polland.

Douglas M. Scheller (Law Offices of Timothy P. McGough, on the brief), Baltimore, for appellee Long & Foster.

Argued before MOYLAN, DAVIS, and EYLER, JJ.

DAVIS, Judge.

This is a premises liability case. Julie V. Wells and Sandra N. Pannenton appeal from a decision of the Circuit Court for Montgomery County (Rupp, J.) granting summary judgment in favor of appellees David M. Polland and Long & Foster Real Estate, Incorporated (Long & Foster). Appellants were injured when an exterior wooden staircase on which they were standing collapsed. The staircase was attached to a beach home owned by Polland. Long & Foster had posted a "sale" sign outside of the house. Appellants filed suit against appellees. Appellee Polland filed a cross-claim against Long & Foster. Long & Foster made a motion for summary judgment against appellants and Polland. Polland joined in Long & Foster's motion for summary judgment against appellants. Appellants filed a cross-motion for partial summary judgment.

On March 24, 1997, the lower court made an oral ruling granting Long & Foster's and Polland's motion for summary judgment against appellants, finding that appellants were trespassers rather than invitees and that appellees did not engage in willful or wanton misconduct or entrapment. The court determined appellants' cross-motion for partial summary judgment to be moot. The order granting summary judgment in favor of appellees was filed on March 26, 1997. On April 1, 1997, appellants filed a Motion to Alter or Amend the court's judgment. In a Memorandum Opinion, dated June 24, 1997, the court denied the Motion to Alter or Amend. Appellants filed this timely appeal raising two issues for our review, which we reframe below as one question with two sub-issues:

Did the circuit court err in granting appellees' motion for summary judgment by 1) ruling that appellants were trespassers rather than invitees on the property being adver-

tised for sale, and then 2) ruling that appellees did not engage in wanton or willful misconduct or entrapment?

We answer all parts of the question in the negative and affirm the judgment of the circuit court.

## FACTS

On July 13, 1995, during their summer vacation in Ocean City, Maryland, appellants were injured when the exterior wooden staircase they were descending from the front door of a beach home collapsed. At that time, and for the preceding four months, Long & Foster had an exclusive listing to sell the property. Polland was title holder of the property. Long & Foster posted a "sale" sign in front of the premises that read: "Sale" "Long & Foster, Realtor" "524–7100"—the telephone number being that of the local Long & Foster office. Long & Foster had Polland sign a Maryland Residential Property Disclosure Statement (disclosure statement) on March 18, 1995. The disclosure statement indicated to Long & Foster that Polland was offering the property for sale "as is" and without representations and warranties by the owner as to the condition of the property or improvements thereon.

Polland had received several notices about the dangerous condition of the beach house from the Town of Ocean City's Building Code Enforcement Office. The first written notice came in July, 1991, four years before the collapse of the staircase. The notice advised Polland that the property in question violated several provisions of the housing code. It specifically advised Polland that the "**STAIR NEEDS TO BE REPLACED.**" An Ocean City Building Code Enforcement Officer had inspected the staircase and found it structurally unsound.

On August 26, 1992, Polland spoke with Building Code Enforcement Officer Kevin Brown by telephone. At that time, Polland indicated that he had not been in or seen his building for five years. In his discussion with Polland, Officer Brown specifically alluded to the unsound condition of the stairs.

In March 1993, Michael B. Richardson, an Ocean City Building Inspector, personally visited the property and subsequently spoke to Polland or his agent(s) about concerns with the house, including vagrants entering and exiting the property. Although this prompted Polland to have some of the windows boarded up and door locks replaced, he never repaired or removed the stairs.

Long & Foster's listing agent first visited the property in March 1995. He walked up the outside staircase to the front door of the property. He testified that the staircase had yellow "caution" tape draped across the lower portion. He stepped over it when he climbed the stairs. He also testified that there was a sign nailed to the front of a step of the exterior staircase that indicated that the property was uninhabitable. Notwithstanding this knowledge, Long & Foster posted a "sale" sign on the property with Polland's permission and consent. It was this sign that drew appellants' attention to the property.

At the time of the incident, an Exclusive Listing Agreement (agreement) was in effect between Long & Foster and Polland. It was pursuant to that agreement that Long & Foster placed the "sale" sign in front of the house. In that agreement, Polland contractually agreed that he, not Long & Foster, was responsible for the care, physical condition, management, maintenance, and repair of the property.

In the proceedings below, Long & Foster asserted that it was only selling the land and not Polland's home on the land. Nevertheless, Long & Foster did not use signs that advertised "acreage" only or "lot for sale" only. The sign Long & Foster used did not explicitly indicate that viewing of the premises was "by appointment only." After the incident, Long & Foster posted a "No Trespassing" sign on the property.

The incident occurred on Thursday, July 13, 1995, shortly after 8:00 p.m. Appellants had been vacationing since the previous Saturday at an adjacent rental condominium known as the Lazy Whale. Appellants had become interested in the possibility of buying a place at the beach and they had seen

the Long & Foster "sale" sign displayed in front of Polland's beach house. On the day in question, the door to the lower level of the beach house was open and had been open all week. That Thursday evening, appellants discussed the possibility of buying the beach house and refurbishing it for themselves. Appellants, with appellant Pannenton's son, Jason, decided to inspect the beach house. They did not know who owned the house. They did not attempt to call the phone number on the "sale" sign or to make any other attempt to contact Long & Foster about the property before entering the premises.

The "sale" sign and the open ground level door were just off the public sidewalk in front of the property. After observing that the house was obviously unoccupied, appellants and Jason entered through the lower level door and looked around. Desiring to see the main floor, they left the lower level, returned to the public sidewalk, and climbed the exterior wooden staircase leading to the landing at the main entrance to the home. They did not notice any yellow caution tape on the railing or stairs and their access was not obstructed as they ascended the stairs. The door at the top of the stairs was ajar, so they pushed it open a little in order to peak inside what appeared to be a closed-in porch. They did not go inside but were able to look at the main floor through a window inside the porch. As they turned to leave, the exterior staircase collapsed.

Photographs taken the day after the stairs collapsed reveal that there was no fence or physical barrier around the house or blocking the stairs, but there was yellow plastic caution tape tied on the handrail of the staircase. Appellants testified that they did not notice any yellow tape when they climbed the stairs. Building Inspector Brown testified that he had wrapped the yellow caution ribbon around the guardrail and posted an "occupancy prohibited" sign on the house prior to the date of the incident. The photographs taken after the occurrence also reveal an "occupancy prohibited" sign attached to the house, which was issued by the Town of Ocean City. The investigating officer who responded to the scene on the day after the incident filed a police report stating that he

found a "yellow piece of caution tape wrapped around the right hand side of the railing" and an "8" X 11" yellow condemnation sign that had been stapled to the footing of the top step at approximately eye level." There were not any "no trespassing" signs on the property.

Appellants' suit against appellees followed. After the close of discovery, appellee Long & Foster filed a Motion for Summary Judgment on appellants' claims. Appellee Polland subsequently joined in that Motion for Summary Judgment.

After a hearing on the motion, the lower court held that appellants were not invitees, but were trespassers on the property when the incident occurred. The lower court held further that, since appellees' actions did not constitute willful or wanton misconduct or entrapment, they did not breach the standard of care they owed to the trespassing appellants. Accordingly, the court entered judgment in favor of appellees. Appellants filed a Motion to Alter or Amend Judgment—Court Decision, which the court subsequently denied. This appeal followed.

## LEGAL ANALYSIS

Motions for summary judgment are governed by MARYLAND RULE 2–501, which provides that, "[t]he [trial] court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." MARYLAND RULE 2–501(e) (1998). See also *Bagwell v. Peninsula Regional Medical Ctr.*, 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996) (holding the trial court to the same requirements as MARYLAND RULE 2–501). To defeat a motion for summary judgment, the party opposing the motion must present admissible evidence to show the existence of a dispute of material fact. *Bagwell*, 106 Md.App. at 488, 665 A.2d 297. In making its determination, the circuit court must view the facts and all inferences from those facts in the light most favorable to the non-moving

party. *Brown v. Wheeler,* 109 Md.App. 710, 717, 675 A.2d 1032 (1996).

In *Laws v. Thompson,* 78 Md.App. 665, 674, 554 A.2d 1264, *cert. denied, Thompson v. Laws,* 316 Md. 428, 559 A.2d 791 (1989), this Court noted:

> The purpose of the summary judgment procedure is to dispose of cases where there is no genuine factual controversy. Summary judgment is not, however, designed as a substitute for trial, but a hearing to determine whether a trial is necessary. "The critical question for the trial court on the motion for summary judgment is whether there exists a genuine dispute as to a material fact and, if not, what the ruling of law should be upon those undisputed facts."

(Citations omitted.)

In *Clea v. Mayor and City Council of Baltimore,* 312 Md. 662, 541 A.2d 1303 (1988), the Court of Appeals wrote that "disposition by summary judgment is generally inappropriate in cases involving motive or intent." *Id.* at 677, 541 A.2d 1303 (quoting *DiGrazia v. County Exec. for Mont. Co.,* 288 Md. 437, 445, 418 A.2d 1191 (1980)). The Court further explained that, "even where the facts are undisputed, if those facts are susceptible to reasonable inferences supporting the position of the party opposing summary judgment, then a grant of summary judgment is improper." *Id.* (citing *DiGrazia,* 288 Md. at 445, 418 A.2d 1191) (other citations omitted).

The standard for appellate review of a trial court's denial of a motion for summary judgment requires us to determine whether the trial court was legally correct. *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 590–91, 578 A.2d 1202 (1990); *Barnett v. Sara Lee Corp.,* 97 Md.App. 140, 146, 627 A.2d 86, *cert. denied,* 332 Md. 702, 632 A.2d 1207 (1993). In so doing, we review the same material from the record and decide the same legal issues as the circuit court. *Nationwide Mut. Ins. Co. v. Scherr,* 101 Md.App. 690, 695, 647 A.2d 1297 (1994), *cert. denied, Scherr v. Nationwide,* 337 Md. 214, 652 A.2d 670 (1995).

■ Recovery in an action for negligence requires proof of some duty, a breach of that duty, proximate causation, and damages. *Flood v. Attsgood Realty Co.*, 92 Md.App. 520, 524, 608 A.2d 1297 (1992). In the present case, for us to disturb the trial court's ruling on appeal, appellants must show that there was either a genuine dispute as to a material fact involving at least one of the above elements or that appellees were not entitled to judgment as a matter of law. *Id.* As we shall explain, we perceive no legally cognizable dispute as to material fact from the record before us. The facts also did not give rise to a reasonable inference that Polland engaged in willful or wanton misconduct.

■ It is a venerable principle of Maryland law that in negligence actions the duty or standard of care owed to a person by an owner or occupier of land is determined by that person's purpose for being on the property. *Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md.App. 381, 387, 693 A.2d 370 (1997); *Mech v. Hearst Corp.*, 64 Md.App. 422, 426, 496 A.2d 1099 (1985), *cert. denied*, 305 Md. 175, 501 A.2d 1323 (1986) (citing *Bramble v. Thompson*, 264 Md. 518, 521, 287 A.2d 265 (1972)). Maryland maintains the common law classifications of invitee (i.e. business invitee), licensee by invitation (i.e. a social guest), bare licensee, and trespasser. *Tennant*, 115 Md.App. at 387–88, 693 A.2d 370 (citing, *inter alia*, *Baltimore Gas & Elec. Co. v. Lane*, 338 Md. 34, 44, 656 A.2d 307 (1995)).[1] The highest duty is owed to invitees which, in general, are persons invited or permitted to enter or remain on one's property for purposes connected with or related to business.[2] *Tennant*, 115 Md.App. at 388, 693 A.2d 370. The owner or occupier must use reasonable and ordinary care to keep his premises safe for the invitee and to protect the invitee from injury caused by an unreasonable risk, about which the owner knows or could have discovered, and that the

---

1. Lane has since been overruled on other grounds by *Baltimore Gas and Electric Co. v. Flippo*, 348 Md. 680, 705 A.2d 1144 (1998).

2. Consequently, the term "business invitee" is sometimes used.

invitee, by exercising ordinary care for his or her own safety, is unlikely to discover. *Tennant,* 115 Md.App. at 388, 693 A.2d 370. A licensee is one who enters property with the possessor's knowledge and consent but for his or her own purpose or interest. *Mech,* 64 Md.App. at 426, 496 A.2d 1099. The owner owes no duty to a licensee under the traditional common law view except to abstain from willful or wanton misconduct or entrapment.[3]  *Id.* (citing *Bramble,* 264 Md. at 521, 287 A.2d 265). The same standard applies to trespassers, defined as those who intentionally enter without privilege or consent of the land owner. *Id.* (citing *Bramble,* 264 Md. at 522, 287 A.2d 265). "This rule of limited liability to trespassers permits 'a person to use his own land in his own way, without the burden of watching for and protecting those who come there without permission or right.'" *Wagner v. Doehring,* 315 Md. 97, 102–03, 553 A.2d 684 (1989) (quoting W. Prosser, The Law of Torts § 58 at 395 (W. Keeton 5th ed. 1984) (footnote omitted)).

As appellants assert in support of their contention that they were invitees, invitee status can be established under two doctrines: (1) mutual benefit or (2) implied invitation. *Howard County Bd. of Educ. v. Cheyne,* 99 Md.App. 150, 155, 636 A.2d 22, *cert. denied, Cheyne v. Howard County,* 335 Md. 81, 642 A.2d 192 (1994). The mutual benefit theory is typified by the person who enters a business establishment to purchase goods or services. *Id.* This theory places great weight on the subjective intent of appellants. *Id.* The court must inquire: Did appellants intend to benefit the land owner in some manner? As we explain *infra,* we do not find that appellants were invitees under the mutual benefit doctrine because the relevant facts and case law do not support such a finding.

In comparison to the mutual benefit doctrine, the theory of implied invitation is objective and does not rely on

---

**3.** Traditionally, police officers and fire fighters are held to be licensees when they enter property in the performance of their duties. *See Southland Corp. v. Griffith,* 332 Md. 704, 713, 633 A.2d 84 (1993).

any mutual benefit. *Id.* at 156, 636 A.2d 22. Rather, it gains its vitality from such circumstances as custom, the habitual acquiescence of an owner, the apparent holding out of premises for a particular use by the public, or the general arrangement or design of the premises. *Id.* (citing *Crown Cork and Seal Co. v. Kane*, 213 Md. 152, 159, 131 A.2d 470 (1957)). The crux of the implied invitation theory is the distinction between mere acquiescence and direct or implied inducement. *Kane*, 213 Md. at 159, 131 A.2d 470.

*Kane* is the seminal Maryland case on implied invitation. In that case, Kane, a truck driver, while waiting for his truck to be loaded, left the docking area and proceeded to a smoking room in Crown's basement. Since no smoking was permitted in the docking area, Kane, like numerous other truckers, habitually accessed the smoking room during their wait. As he was returning from the basement, Kane was struck and injured by a forklift. In reaching its holding that there was legally sufficient evidence to take the issue of implied invitation to the jury, the Court explicated:

> The gist of [implied invitation] liability consists in the fact that the person injured did not act merely on motives of his own, to which no act or sign of the owner or occupier contributed, but that he entered the premises because he was led by the acts or conduct of the owner or occupier to believe that the premises were intended to be used in the manner in which he used them, and that such was not only acquiesced in, but was in accordance with the intention or design for which the way or place was adapted and prepared or allowed to be used.

*Id.* at 160, 131 A.2d 470 (quoting *Kalus v. Bass*, 122 Md. 467, 473, 89 A. 731 (1914) (citation omitted)).

Based on this rationale, the Court found that, because the room was set aside for smoking, its location was made known to the plaintiff by Crown employees on two prior occasions, the room was habitually used by truckers, this use was known by the foreman, and the absence of any notice to plaintiff that the room was solely for employees led to the conclusion that

there was legally sufficient evidence to instruct the jury on implied invitation.

More recently, in *Doehring v. Wagner*, 80 Md.App. 237, 244, 562 A.2d 762 (1989), and *Woodward v. Newstein*, 37 Md.App. 285, 293, 377 A.2d 535 (1977), we have discussed the view of the *Kane* Court in light of the Restatement (Second) of Torts § 332 comment c (1965), "Factors important in determining invitation," which states that "the important thing is the desire or willingness to receive that person which a reasonable man would understand as expressed by the words or other conduct of the possessor."

## I

As noted *supra*, appellants in the instant case contend that they were invitees on the property. Although they concede that they did not seek permission to enter and that they were not expressly invited to enter the property, they assert that they were invitees under both the mutual benefit and implied invitation doctrines. Appellees, of course, disagree with appellants' position, as do we.

As we noted above, an individual may be considered an invitee by operation of the mutual benefit doctrine if "the individual on the premises was present for the mutual benefit of owner and visitor and not acting solely for his own personal pleasure or benefit." *Woodward*, 37 Md.App. at 292, 377 A.2d 535 (footnote omitted). In that case, this Court went on to say, however, that "[a]pplication of the mutual benefit theory generally involves the conduct of a business by the possessor of land." *Id.* at 293, 377 A.2d 535. Appellants have cited no Maryland cases that have applied the mutual benefit doctrine to a situation in which the possessor of land was not conducting some sort of retail or commercial business thereon at the time of the accident.

Instead, appellants cite both *Woodward* and *Cheyne* in support of their contention that the mutual benefit doctrine applies beyond the retail and commercial business settings. In both of those cases, however, this Court found that the

mutual benefit doctrine did not apply. Nevertheless, appellants argue that the mutual benefit doctrine applies because they were interested in "inspecting [the house] with a view toward determining whether this was a beach house which they would be interested in purchasing as a summer home." Similarly, in *Woodward,* individuals were standing on the exterior staircase of a home when it collapsed. Two of the injured individuals stated in their depositions that "they had no specific interest in purchasing the property but that they would have considered it if they liked what they saw." *Woodward,* 37 Md.App. at 292 n. 8, 377 A.2d 535. Nonetheless, this Court found that the mutual benefit doctrine did not apply in *Woodward.*

Cases in which the mutual benefit doctrine has either been found to apply or found to be a question for the jury, involve situations in which a clear benefit to the land owner was involved. *See generally, Austin v. Buettner,* 211 Md. 61, 66–68, 124 A.2d 793 (1956) (plaintiff fell when entering a tavern for the purpose of soliciting business of his employer); *Peregoy, Use of Himself & Globe Indem. Co. v. Western Maryland R. Co.,* 202 Md. 203, 207–09, 95 A.2d 867 (1953) (employee of building materials dealer, a patron of the railway, was injured while loading some materials from the storage space on the railway that it had allowed the employer to use for twenty-five years); *Kane,* 213 Md. at 156–59, 131 A.2d 470 (an employee of a trucking company who was at the warehouse to pick up a load was injured at the warehouse while returning from the smoking room).

In this case, appellants entered Polland's property after observing that it was uninhabited and without any express permission. Just as in *Woodward,* it seems that appellants had no specific interest in purchasing Polland's particular property, but would have considered it if they liked what they saw. In other words, they were not specifically intending to benefit Polland by their conduct.

Next, appellants analogize between the open ground level door of the beach house and a retail store's open door, which is

"truly and invitation during regular business hours." *Wood-ward,* 37 Md.App. at 293, 377 A.2d 535. We find the analogy illogical. Appellants testified that Polland's premises had appeared to be unoccupied all week and was apparently unoccupied on the day of the incident. Consequently, unlike a retail store with open doors, there was no one present to consent to appellants' entry on the property, or to assist them inside. An unoccupied house with an open basement door and a "sale" sign out front, and nothing more, is simply not analogous to a retail store with a staff present to welcome and assist potential customers. Rather, appellants' entry into the unoccupied beach house is analogous to entering a retail store that has closed for the day.

It is unreasonable to suggest that every time an owner or real estate company places a "sale" sign outside a house, the owner or company are "inviting" people to come in, and we are hesitant to hold as such.[4] If, however, the owner or real estate agent or both are having an open house or conducting tours, then perhaps an analogous situation would be present. To hold otherwise would mean that anytime an owner puts a property up for sale and posts a simple "sale" sign in front of the property, the public-at-large would be free to enter the property at anytime of the day or night with the benefit of being an invitee rather than a trespasser.

Appellants also argue that they are invitees under the doctrine of implied invitation. Appellants, however, could not be accorded invitee status under the implied invitation doctrine unless they showed that either of appellees customarily permitted potential buyers to enter upon the property without prior notice to appellees and, that in reliance on that knowledge, appellants entered the property. Alternatively, appellants could show that the beach house was designed or constructed in such a fashion as to encourage the public to climb

---

4. Indeed, if a person puts a "sale" sign in the window of an automobile and leaves the door unlocked, that does not mean that any person walking down the street who claims to be interested in purchasing the car can just open the door and get in.

the exterior stairway, such that a legal right to enter onto Polland's property could objectively be inferred. The facts do not support a finding that appellants were invitees under either option of the implied invitation doctrine. We explain.

It is undisputed that during their stay in Ocean City appellants never observed any other unaccompanied potential purchasers enter Polland's house. Indeed, they did not observe any activity at the house. Although appellants argue that the fact that the house was unoccupied was reason to believe that it was permissible for them to enter the premises, we are not persuaded that that was a reasonable inference. We believe that the lack of activity observed by appellants reasonably permits but one inference, i.e., that appellees did not customarily allow potential buyers to enter the property unaccompanied, without prior notice, and without express permission.

In an attempt to buttress their contention that they were invitees, appellants assert that the design of the house, with only the exterior staircase leading to the main entrance, the basement door wide open and the main door ajar and, a "sale" sign, gives rise to an implied invitation. We disagree.

Houses similar in design to the one in question are commonplace in Ocean City. Although the stairs adjoined a public sidewalk, they were part of the privately owned beach house. We do not consider the "sale" sign an invitation to come onto the property. Rather, it merely notifies those who may see it that the property is for sale and it provides a phone number for the realtor who may then make arrangements to view the property. Appellants have cited no Maryland cases that recognize the right to enter the private property of another based solely on the fact that the property is for sale. As for the open doors, we noted in *Mech,* 64 Md.App. at 427, 496 A.2d 1099, that, "[e]ven in an urban setting, the presence of an open gate leading to an unmarked lot, does not, in our view, indicate acquiescence to intrusions, let alone inducement [to enter]".

The parties have cited only two Maryland cases that even refer to a "For Sale" sign posted on property. Neither case supports the proposition that such a sign, without more, is to

be construed as an invitation to enter the property. The first case, *Carroll v. Spencer*, 204 Md. 387, 104 A.2d 628 (1954), addressed the legal status of two young boys who were injured while engaging in a mud ball fight inside a home under construction. In their suit against the builder, plaintiffs alleged that, since the builder had posted a "For Sale" sign, an invitation was extended for the public to enter and inspect the property. The *Carroll* Court stated: "Whatever the effect of the for sale sign as an invitation to prospective purchasers, clearly it was not an invitation express or implied, for children to come and play on the property." *Id.* at 393, 104 A.2d 628. Consequently, *Carroll* sidesteps the issue presented in the instant case.

The second Maryland case, *Woodward*, 37 Md.App. 285, 377 A.2d 535 (1977), with a similar fact pattern to the instant case, involved an action brought by individuals who sustained personal injuries when the deck of a home believed to be for sale collapsed underneath them. In upholding the trial court's grant of a motion for summary judgment, finding that the injured parties were trespassers as a matter of law, the issue on appeal was whether the conduct of the owner or his real estate agent created the impression that the plaintiffs could enter the property without permission. Plaintiffs argued that they were invitees as a result of the owner or realtor's allegedly implied invitation created by previous advertisements for sale and the owner's previous acquiescence in showing the property on eighteen prior occasions. Noting that the advertisements for the property were "grossly out-of-date" and did not provide the property's address, that no "For Sale" sign was posted on the property, and that the owner had previously acquiesced to eighteen prior escorted showings of the property, the *Woodward* Court held that no implied invitation to enter the property was created. The Court found support for its decision in a review of the following cases from other jurisdictions.

In *Mortgage Commission Servicing Corp. v. Brock*, 60 Ga.App. 695, 4 S.E.2d 669 (1939), in response to a newspaper advertisement and without first contacting the realty agency,

the plaintiff fell down a flight of stairs in a dark hallway as she attempted to inspect the premises. In upholding the trial court's dismissal of the complaint, the *Brock* Court stated:

Clearly it [the advertisement] contains no express invitation to the public to inspect any of the premises listed in the advertisement, and candor requires the view that it holds out no implied invitation. It merely calls the attention of the reader to the fact that certain unfurnished apartments are available for leasing.... There is not in the body of the advertisement, at its beginning or at its end, any statement from which the implication could reasonably be drawn that any interested party was at liberty to proceed ... to inspect the apartments.... The only reasonable construction to be placed upon it is that the owner, through his agents, was informing the public of certain premises which were available for leasing at named rentals, and that if anyone was interested he was invited to communicate with Draper–Owens Co. [the agent].... The insertion of the particular advertisement without an express invitation does not, therefore, carry with it the implication that the reader was invited to inspect the premises without first communicating with the [realtor]."

*Woodward,* 37 Md.App. at 295–96, 377 A.2d 535 (quoting 4 S.E.2d at 672).

Similarly, the *Woodward* Court examined the facts and holding of *Wilkie v. Randolph Trust Co.,* 316 Mass. 267, 55 N.E.2d 466 (1944). In that case, the defendant listed the property for sale with a realtor and a "For Sale" sign was placed in a front window. After plaintiffs contacted the realtor, obtained the house keys, inspected the property, and returned the keys, the plaintiffs returned to the house and, while standing on the back door platform, the railing gave way and injuries occurred. After noting that an invitation has its limitations, the *Wilkie* court stated:

The building was closed so far as the reception of prospective buyers was concerned. This condition of the property, even though it was on the market for sale, would not constitute an invitation to the general public, or even to

those who might be desirous of becoming owners, to enter upon the premises for the purpose of inspecting them without any consent or any further action by the owner. The situation is entirely different from that of a storekeeper, the maintenance of whose shop creates a continuous invitation during the usual business hours to all members of the public who desire to trade with him. Here, the owner retained the right to select the persons who should go upon the land and examine the house. Even though the plaintiffs were still considering the purchase of the property when they made the second visit, they did not acquire the status of invitees in the absence of some conduct upon the part of the defendant which induced them to make this visit.

*Woodward*, 37 Md.App. at 296, 377 A.2d 535 (quoting 55 N.E.2d at 467–68).

While considering a "For Sale" sign to be one factor to be considered, the Court in *Woodward* found that the prospective purchasers entered the property without an express or implied invitation. Consequently, the Court reasoned they were trespassers, or at best, bare licensees, and therefore, were owed only the duty to refrain from willful or wanton misconduct. *Woodward*, 37 Md.App. at 297, 377 A.2d 535. The Court did not hold that a "For Sale" sign constituted an implied invitation to enter and inspect the premises or that if one were posted in that case that the prospective purchasers would be deemed to be invitees.

As we noted above and the *Brock* Court reasoned, the only reasonable interpretation that can be made about the Long & Foster sign in this case is that Polland, through Long & Foster, intended to sell his property and that all interested purchasers should contact Long & Foster. In other words, the "sale" sign provided information, not an invitation. Therefore, appellants were not invitees, and the trial court was correct in its ruling.

## II

Finally, appellants argue that the circuit court erred when it determined as a matter of law that appellees did not engage in

willful or wanton misconduct or entrapment. As to this notion, we disagree with appellants because there is no evidence which supports a reasonable inference that either of appellees engaged in willful or wanton misconduct or entrapment.

■■■ There is a distinction between "willful" and "wanton" misconduct. Willful misconduct is performed with the actor's actual knowledge or with what the law deems the equivalent to actual knowledge of the peril to be apprehended, coupled with a conscious failure to avert injury. *Doehring,* 80 Md.App. at 246, 562 A.2d 762 (1989). By contrast, a wanton act is one performed with reckless indifference to its potential injurious consequences. *Id.* The term "wanton" generally denotes "conduct that is extremely dangerous and outrageous, in reckless disregard for the rights of others." *Mech,* 64 Md.App. at 428–29, 496 A.2d 1099.

As stated supra, "disposition by summary judgment is generally inappropriate in cases involving motive or intent." *Clea,* 312 Md. at 677, 541 A.2d 1303 (quoting *DiGrazia,* 288 Md. at 445, 418 A.2d 1191). *See also National Micrographics Systems, Inc. v. OCE–Industries, Inc.,* 55 Md.App. 526, 544, 465 A.2d 862 (1983), *cert. denied, Oce–Industries, Inc. v. Nat. Micrographics,* 298 Md. 395, 470 A.2d 353 (1984) (citing *Berkey v. Delia,* 287 Md. 302, 324–26, 413 A.2d 170 (1980), for the proposition that whether a party's motive or intent amounts to malice is generally a jury question). "[E]en where the facts are undisputed, if those facts are susceptible to reasonable inferences supporting the position of the party opposing summary judgment, then a grant of summary judgment is improper." *Clea,* 312 Md. at 677, 541 A.2d 1303 (citing *DiGrazia,* 288 Md. at 445, 418 A.2d 1191) (other citations omitted).

■■■ We note that Long & Foster contends that it owed no duty to appellants because it was not an owner or occupier of the property in question. Assuming without deciding the issue, however, that Long & Foster did owe such a duty to the trespassing appellants, such a duty, if any, logically should not be more stringent than the duty owed by the owner or

occupier of the land in this case. In other words, the maximum duty, if any, owed by Long & Foster toward appellants would be not to injure or entrap willfully or wantonly the trespassing appellants. In this case, the facts and the reasonable inferences therefrom do not support a finding of such conduct on the part of Long & Foster.

■ Although questions of motive and intent i.e., whether there was willful and wanton misconduct, are generally left to a jury, when there is no evidence of willful or wanton misconduct on which to base the question, summary judgment is appropriate. Long & Foster contractually agreed with Polland to list the property for sale. Pursuant to that agreement, Long & Foster placed a "sale" sign in front of the property with the company's phone number on it. Also pursuant to the agreement, Polland had sole responsibility for the care, maintenance, and repair of the premises. As explained above, the "sale" sign in this case was not an invitation to enter the premises. Long & Foster was not conducting an open house or giving tours of the property. The house was obviously vacant.

Furthermore, when a Long & Foster agent inspected the premises, he observed the yellow "caution" tape on the stairs and the "uninhabitable" sign. Although the agent stepped over the tape and ignored the sign, he testified that he did so because he believed he should inspect the property in order to see what Long & Foster would be selling. In light of the facts, it was not willful or wanton misconduct for Long & Foster not to put up a "no trespassing" sign or a sign that indicated that only the lot was for sale.

Indeed, immediately after inspecting the premises and before listing the property for sale, Long & Foster advised Polland to tear down the house because it believed that whoever bought the property would need to tear down the house anyway. The advice to tear down the house was in accordance with the contractual agreement between appellees that Polland be responsible for maintenance and repairs.

As there was no evidence that Long & Foster engaged in willful or wanton misconduct or entrapment, summary judgment was properly granted in its favor.

■ As to Polland, his duty toward appellants is clear. Because they were trespassers, Polland had a duty not to injure or entrap them willfully or wantonly. *Mech,* 64 Md. App. at 426, 496 A.2d 1099. A land owner does not have a duty to make the land safe for trespassers or to warn trespassers of any potential dangers that may lie therein. *See Macke Laundry Serv. Co. v. Weber,* 267 Md. 426, 429–32, 298 A.2d 27 (1972) (contrasting the duty of care owed to an invitee as opposed to a trespasser). As stated above, the question of whether someone's actions were willful or wanton is generally left to a jury, unless there are no facts, or reasonable inferences that can be drawn therefrom, that support a finding of willful or wanton misconduct.

■ In the instant case, there are no facts that support or give rise to a reasonable inference that Polland engaged in willful or wanton misconduct as a matter of law. Although Polland knew about the dangerous condition of the stairs four years prior to the incident and did not repair or remove them, this inaction does not give rise to a reasonable inference of a reckless indifference to the potential for injurious consequences.

■ Regardless of how the standard for trespassers is defined, a review of Maryland case law reveals that liability for injury to trespassers is imposed only in those cases in which the land owner has engaged in conduct calculated to or reasonably expected to lead to injury of the trespasser. *Doehring,* 80 Md.App. at 246, 562 A.2d 762 (1989). The following cases illustrate just how deliberate the land owner's conduct must be in order to be considered willful and wanton misconduct.

In *Doehring,* the land owners hung a chain between two posts erected on each side of their driveway with the intention of impeding motorcyclists from using their driveway to gain

access to a dirt path. *Id.* at 240–41, 562 A.2d 762. The land owners were aware that motorcyclists frequently used their driveway in this manner at all hours of the day and night. *Id.* One night, the plaintiff drove his motorcycle onto the driveway at a high speed. *Id.* at 241, 562 A.2d 762. The plaintiff hit the chain and suffered fatal injuries. *Id.* We held, as a matter of law, that erection of the chain did not constitute willful or wanton misconduct. *Id.* at 249, 562 A.2d 762. *See also Carter v. Baltimore Gas & Elec. Co.*, 25 Md.App. 717, 336 A.2d 790 (1975) (same result on similar facts except that accident occurred during the day). Moreover, in *Carter,* "[w]e attributed no significance to the company's failure to post warning signs, or to the 'virtually invisible' appearance of the cable or to the fact that the company was aware of frequent trespassing across the driveway by children." *Doehring,* 80 Md.App. at 248, 562 A.2d 762.

In *Bramble,* 264 Md. at 526, 287 A.2d 265, and *Mech,* 64 Md.App. at 428–29, 496 A.2d 1099, the Court of Appeals and we, respectively, held, as a matter of law, that the defendant land owners were not liable for injuries sustained by inadvertent trespassers who were attacked by the land owners' unrestrained guard dogs, that were known by the owners to be vicious.

In *Carroll v. Spencer,* 204 Md. 387, 104 A.2d 628 (1954), the plaintiff was an eight-year old child who fell into a hole in the floor of a partially constructed house. There were no barriers preventing him and his companions from entering the house, nor were there any signs warning them not to enter. The Court of Appeals held that there was no liability as a matter of law.

In *State v. Longeley,* 161 Md. 563, 158 A. 6 (1932), it was alleged that the defendant owned an abandoned quarry that was unfenced in violation of a local ordinance. *Id.* at 564–66, 158 A. 6. It was alleged that the quarry was located in a densely populated area, was accessible to children, and was filled with water. *Id.* at 565, 158 A. 6. It further was alleged that the owners of the quarry knew that young children

constantly played in and about the quarry and that no warnings were posted. *Id.* The Court of Appeals held as a matter of law that the quarry owners were not liable for the drowning death of a twelve-year old boy. In so ruling, the Court declined to adopt the attractive nuisance doctrine.

In *Herring v. Christensen*, 252 Md. 240, 241–42, 249 A.2d 718 (1969), the Court of Appeals declined to adopt the attractive nuisance doctrine to save the claim of a three-year old plaintiff who wandered onto the defendants' unfenced premises, and was injured in a trash fire that the defendants maintained on the property.

In *Barnes v. Housing Auth. of Baltimore City*, 231 Md. 147, 189 A.2d 100 (1963), the three-year old plaintiff fell into an uncovered, concrete access well located in the housing project in which he lived. The well was located just eighteen inches from a paved walkway that led to a playground. *Id.* at 150, 189 A.2d 100. When the child strayed from the walkway, he ceased to be an invitee, and could not recover. *Id.* at 152, 189 A.2d 100.

In *Benson v. Baltimore Traction Co.*, 77 Md. 535, 26 A. 973 (1893), it was alleged that the president of Baltimore Traction Company [5] granted permission to a school graduating class to visit the company's power house. An employee showed the plaintiff and his classmates through the ground floor and basement of the powerhouse, pointing out certain machinery and warning of its dangers. *Id.* at 538, 26 A. 973. He then left the group and instructed them to look around for themselves without warning them of any further dangers. *Id.* While looking around, the plaintiff fell into an uncovered vat of boiling water that was flush with the floor and located in a poorly lighted area of the building. The trial court sustained the defendant's demurrer, and the Court of Appeals affirmed.[6]

---

5. It is this Court's understanding that the Baltimore Traction Company was a cable car company that operated cable cars between Druid Hill and Patterson Parks.

6. Although the plaintiff in *Benson* was a bare licensee, as opposed to a trespasser, the Court appeared to presume that the same standard of

In each of these cases, except perhaps *Benson,* in which the injured party was a bare licensee, trespassers had access to the defendants' property, and it was foreseeable that a trespasser would be injured by a condition located on the property. In many of the cases, there was actual knowledge that trespassers were on the property or routinely used the property. With the exception of *Longeley,* each of the cases involved a danger that was affirmatively created by the land owner. Moreover, it appears that in each case danger could have been averted without much effort or expense. Yet, in none of the cases did the land owner's conduct meet the wanton or willful standard. Considering the overwhelming authority, Polland's conduct, while arguably grossly negligent, simply does not rise to the level of wanton or willful.

Indeed, Polland did not want trespassers on the property in question, and did not expect anyone to attempt to visit the obviously vacant property. There was evidence that Polland had arranged, at some point, for some of the windows to be boarded up and the locks to be repaired or changed in order to keep out vagrants. At some point before the incident, a city official or officials placed yellow "caution" tape across the stairs and affixed a yellow "uninhabitable" sign to them. Although it is unclear whether Polland knew of the "caution" tape and the "uninhabitable" sign, a reasonable inference is that he knew, because city officials informed him of the dangerous conditions subsequent to their inspections. The trial court was legally correct when it determined that Polland's conduct was not willful and wanton and granted summary judgment in his favor.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**

---

care is owed to each. *See Benson,* 77 Md. at 541–44, 26 A. 973 ("The vat was . . . in no proper sense a man trap.").