835 A.2d 548

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Douglas F. GANSLER.

Misc. AG No. 81, Sept. Term, 2002.

Court of Appeals of Maryland.

Nov. 12, 2003.

Melvin Hirshman, Bar Counsel and John C. Broderick, Asst. Bar Counsel for the Attorney Grievance Commission of Maryland, for petitioner.

Carmen M. Shepard, Washington, DC, for respondent.

Argued before BELL, C.J., and ELDRIDGE, WILNER, CATHELL, HARRELL, BATTAGLIA, and ROBERT L. KARWACKI (Retired, specially assigned), JJ.

BATTAGLIA, Judge.

Respondent Douglas F. Gansler was admitted to the Bar of this Court on December 18, 1989. On November 7, 2002, the Attorney Grievance Commission of Maryland, by Bar Counsel, acting pursuant to Maryland Rule 16–751(a),[1] filed a petition for disciplinary action, alleging that Gansler violated the following Maryland Rules of Professional Conduct (hereinafter "MRPC"): MRPC 3.1 (Meritorious Claims and Contentions),[2]

---

1. Maryland Rule 16–751(a) provides:

> (a) **Commencement of disciplinary or remedial action.** Upon approval of the [Attorney Grievance] Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

2. MRPC 3.1 states:

MRPC 3.6 (Trial Publicity),[3] MRPC 3.8 (Special Responsibili-

A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. A lawyer may nevertheless so defend the proceeding as to require that every element of the moving party's case be established.

**3.** MRPC 3.6 states:

(a) A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding.

(b) A statement referred to in paragraph (a) ordinarily is likely to have such an effect when it refers to a civil matter triable to a jury, a criminal matter, or any other proceeding that could result in incarceration, and the statement relates to:

(1) the character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness;

(2) in a criminal case or proceeding that could result in incarceration, the possibility of a plea of guilty to the offense or the existence or contents of any confession, admission, or statement given by a defendant or suspect or that person's refusal or failure to make a statement;

(3) the performance or results of any examination or test or the refusal or failure of a person to submit to an examination or test, or the identity or nature of physical evidence expected to be presented;

(4) any opinion as to the guilt or innocence of a defendant or suspect in a criminal case or proceeding that could result in incarceration;

(5) information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudicing an impartial trial; or

(6) the fact that a defendant has been charged with a crime, unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty.

(c) Notwithstanding paragraph (a) and (b)(1–5), a lawyer involved in the investigation or litigation of a matter may state without elaboration:

(1) the general nature of the claim or defense;

(2) the information contained in a public record;

(3) that an investigation of the matter is in progress, including the general scope of the investigation, the offense or claim or defense involved and, except when prohibited by law, the identity of the persons involved;

(4) the scheduling or result of any step in litigation;

ties of a Prosecutor),[4] MRPC 8.2(a) (Judicial and Legal Officials),[5] and MRPC 8.4(a) & (d) (Misconduct).[6]

---

(5) a request for assistance in obtaining evidence and information necessary thereto;

(6) a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest; and

(7) in a criminal case:

(i) the identity, residence, occupation and family status of the accused; (ii) if the accused has not been apprehended, information necessary to aid in apprehension of that person;

(iii) the fact, time and place of arrest; and

(iv) the identity of investigating and arresting officers or agencies and the length of the investigation.

**4.** MRPC 3.8 states:

The prosecutor in a criminal case shall:

(a) refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause;

(b) make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel;

(c) not seek to obtain from an unrepresented accused a waiver of important pretrial rights, such as the right to a preliminary hearing;

(d) make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal; and

(e) exercise reasonable care to prevent an employee or other person under the control of the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6.

**5.** MRPC 8.2(a) states:

(a) A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office.

**6.** MRPC 8.4 states in relevant part:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

\* \* \*

The charges arose from numerous extrajudicial statements made by Gansler, who has served as the State's Attorney for Montgomery County since January of 1999. By order dated November 13, 2002 and pursuant to Maryland Rules 16–752(a) and 16–757(c),[7] we referred the petition to Judge Julie R. Stevenson of the Circuit Court for Frederick County for an evidentiary hearing and to make findings of fact and conclusions of law. During that hearing, which took place on March 10, 2003, Bar Counsel offered into evidence three videotapes of Gansler's extrajudicial statements and the report of his expert in the case, Professor Abraham Dash. Professor Dash and Professor Lisa Lerman, Gansler's expert, testified at the hearing. Gansler also offered his own testimony as well as that of two Deputy State's Attorneys for Montgomery County.

Judge Stevenson filed a Report and Recommendations on April 29, 2003, in which she presented findings of fact and conclusions of law. Judge Stevenson concluded that Bar Counsel had presented clear and convincing evidence that Gansler, in one instance, had violated MRPC 3.6(a); however, in Judge Stevenson's judgment, the evidence insufficiently supported Bar Counsel's charges that Gansler had violated MRPC 3.6(a) in other instances and had violated other MRPC provisions. Both Bar Counsel and Gansler filed exceptions to Judge Stevenson's findings and conclusions. We overrule Gansler's exception and conclude, further, that he violated

---

(d) engage in conduct that is prejudicial to the administration of justice....

**7.** Maryland Rule 16–752(a) states:

(a) **Order.** Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing. Maryland Rule 16–757(c) states in pertinent part:

(c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law....

MRPC 3.6(a) on more than a single occasion. Accordingly, as to Gansler's extrajudicial statements in which he discussed Cook's confession and his opinion of Cook's and Lucas's guilt, we sustain Bar Counsel's exceptions.

## I. Facts

The undisputed facts in this case have been proven by clear and convincing evidence as required by Maryland Rule 16–757(b). Those facts demonstrate that, between 2000 and 2001, Gansler made several extrajudicial statements in connection with his office's prosecution of various well-publicized crimes. A discussion of the circumstances of each of the extrajudicial statements follows.[8]

### A. The Cook Case

In late January of 2001, Sue Wen Stottsmeister was found beaten and unconscious. She had been accosted while jogging along a recreational path located in the Aspen Hill area of Montgomery County. Ms. Stottsmeister ultimately died from the injuries she suffered during that attack.

Nearly six-months later, on June 4, 2001, Albert W. Cook, Jr. allegedly attacked a woman near his home. Witnesses of that attack chased and kept visual contact with Cook until police arrived and arrested him for that incident. While the police were investigating the June 4, 2001 attack, they began to focus their attention on Cook as a suspect in the murder of Stottsmeister. In the afternoon of June 5, 2001, police officials convened the media for a press conference. Before the press conference began, a Washington D.C. television station broadcasted a report that large sneaker footprints had been found at the scene of the murder and that Cook had large feet that might fit sneakers of that size. The press conference then commenced, and the police announced that Cook would be charged with the Stottsmeister murder.

---

8. The facts we present in this section are based on the findings of fact and evidentiary items relied upon by the hearing judge in her Report and Recommendations.

Gansler attended that press conference and made several statements to the media regarding the anticipated prosecution of Cook. He described Cook's confession and the circumstances surrounding his custodial statements to police:

> The police were able to obtain a confession completely consistent with [Cook's] constitutional rights, he confessed within just a few hours with incredible details that only the murderer would have known. He was then provided the opportunity to rest and ... he slept, and where he had said was one of the best nights of sleep he had gotten in a long time.

> This morning at dawn, he was taken up to the crime scene, video taped by police, and went over in detail by detail every step of what he did to Ms. Stottsmeister this past January.

Gansler further stated that investigators had "boot print matches and that type of thing, or actually in this case the sneaker matches, but we're very confident, obviously more than confident that we have apprehended the right person...."

After the press conference, police charged Cook with the murder of Stottsmeister.[9] The statement of charges, which was filed in the District Court of Maryland, Montgomery County, stated: "Cook provided a full and detailed account of the assault and murder of Stottsmeister.... Cook provided details about the murder that would only be known by the perpetrator of the crime."

## B. The Lucas Case

While asleep during the middle of the night, Monsignor Thomas Martin Wells, a revered member of the Montgomery County community, was beaten and killed in the rectory at his parish. On June 17, 2000, the Montgomery County police arrested Robert P. Lucas and charged him with the murder of

---

9. Judge Stevenson noted, specifically, that the statement of charges in Cook's case had not been filed at the time of the June 5, 2001 press conference.

Monsignor Wells. The statement of charges stated that the police had observed Lucas "wearing shoes having a shoe print consistent with the ones found on the crime scene" and that after Lucas was arrested, he "admitted breaking into the church rectory and responsibility for Well's murder."

The police held a press conference on June 18, 2000 to announce the arrest of Lucas and the charges against him. Gansler spoke at the press conference:

> The Montgomery County Police ... were able to determine definitively that indeed it was Mr. Lucas who had committed the crime. They were able to do so by following him. They conducted surveillance for over 24 hours. And then when they actually found him, he was wearing a very unique shoe, a very unique boot, and the print of that boot matched the print that was found at the scene of the crime, and then further questioning revealed, in fact, he was the person that had done it.

He offered several remarks about the evidence against Lucas, which he described as "a confession from the perpetrator as well as scientific and forensic evidence to corroborate that confession...." Gansler then expressed his opinion that "we have found the person who committed the crime at this point" and that the case against Lucas "will be a strong case."

Additionally, Gansler commented at the press conference that "it was a violent murder" and that Lucas "has a criminal record which includes residential burglaries and that will be obviously something that will come out later on as well." In fact, Lucas's criminal record came out again later, when Deputy State's Attorney Katherine Winfree discussed it at Lucas's bond hearing on the Monday after the press conference.

## C. The Perry Case

James Edward Perry was convicted in the Circuit Court for Montgomery County of first-degree murder and sentenced to death for his role in the 1993 killings of an 8 year-old quadriplegic boy, the boy's mother, and a nurse. Although

upheld on direct appeal, in post-conviction proceedings, Perry's conviction was reversed by this Court on December 10, 1999.

On January 4, 2000, the *Washington Post* ran an article describing Gansler's discussions with family members of the victims of the 1993 murders. The article explained that Gansler had asked the family members whether Perry should be retried or offered a plea agreement. Quoted in the article was Perry's attorney, William Jordan Temple, who commented that he "certainly would look forward" to a plea offer because "anyone faced with the possibility of a death penalty considers an offer of life."

While preparing for Perry's retrial, Gansler made extrajudicial statements that the *Gazette Community News* published on April 5, 2000. According to the *Gazette's* report, Gansler had announced that "he has decided to offer [Perry] a plea bargain" and that, "when the offer is formally presented, Perry would have six weeks to make a decision." The article also recounted the events of a hearing in the Perry case, held the day before, at which the court appointed new defense counsel. At that hearing, according to the *Gazette*, the prosecutor "did not mention the plea bargain offer" and Perry's lawyers "declined to discuss a plea offer or any details about the case."

On or about July 6, 2000, Gansler again appeared in front of television cameras. Responding to questions from the media, Gansler remarked that "the Court of Appeals' decision to reverse the original conviction of Mr. Perry was a completely result oriented opinion." Gansler expressed his view that the "four to three" opinion "was clearly an effort to overturn the death penalty in the Perry case."

### D. The Bomb Threat Case

On February 8, 2000, the *Montgomery County Journal* published an article reporting the dismissal of charges against two Montgomery County teenagers who had been accused of calling bomb threats to Wheaton High School. At the juve-

niles' trial, the State presented evidence of two telephone calls that purportedly were the bomb threats. One of the calls, the article stated, could not be linked to either juvenile, and the other had been made three days prior to the alleged bomb threat. The article quoted the presiding judge, who in dismissing the charges, said, "I have no idea who did this" and "I have no evidence." The *Journal* account relayed Gansler's comments that "his office will continue to prosecute youths suspected of making bomb threats, even if the case is not strong enough to warrant a conviction." Gansler was quoted as saying, "We try hard cases.... Juveniles who phone in bomb threats will be prosecuted. It's more important to prosecute someone and have them acquited[sic] than let them commit crimes with impunity." [10]

## II. The Hearing Judge's Conclusions of Law

The hearing judge concluded that Gansler committed a single violation of MRPC 3.6 by making extrajudicial statements about his decision to offer a plea agreement in the Perry case. The judge determined that those statements clearly violated the general proscriptions of MRPC 3.6(a) as well as the specific provisions of MRPC 3.6(b)(2) limiting extrajudicial references to plea agreements. Furthermore, in the hearing judge's estimation, Gansler's plea agreement remarks found no safe harbor under MRPC 3.6(c), which provides that certain types of statements *are permissible* even though, under MRPC 3.6(a), those statements might have a "substantial likelihood of materially prejudicing an adjudicative proceeding."

---

**10.** In the proceedings before the hearing judge, Bar Counsel presented evidence of numerous other extrajudicial statements by Gansler that Bar Counsel considered objectionable. The hearing judge's Report and Recommendations do not refer to those other statements, and Bar Counsel has not raised any exceptions based on those statements. Because Bar Counsel failed to take exceptions to the hearing judge's factual findings, we consider only those statements discussed by Judge Stevenson to be at issue. *See* Maryland Rule 16–759(2)(B) ("The [Court of Appeals] may confine its review to the findings of fact challenged by [a party's] exceptions.").

The hearing judge found no violations with respect to Gansler's other extrajudicial statements. The judge concluded that Gansler's references to the physical evidence against Cook and Lucas fell under the safe harbor provision of MRPC 3.6(c)(2), which allows a lawyer to state, "without elaboration," "information contained in a public record" notwithstanding the strictures of MRPC 3.6(a) or MRPC 3.6(b). In the hearing judge's view, the "public record" safe harbor suffered from First Amendment vagueness concerns because it was susceptible of multiple and widely varying interpretations. Lacking a precise definition, the judge indicated that the terms "without elaboration" and "public record" fail to provide lawyers with adequate guidelines for determining when "remarks pass from protected to prohibited."

The hearing judge, however, conveyed concern over Gansler's comments regarding the Cook and Lucas confessions, which, she stated, "clearly do no fall under [the safe harbor provision of MRPC] (c)(2)," violated "the spirit of [MRPC] 3.6" and "could create a substantial likelihood of materially prejudicing an adjudicative proceeding." Nevertheless, the judge found no violations of MRPC 3.6 in these comments because she determined that, due to their timing, no material prejudice actually flowed from them.[11]

The judge examined Gansler's extrajudicial criticism of this Court's reversal of Perry's conviction in light of MRPC 8.2. The judge agreed with Bar Counsel's expert, who considered Gansler's comments "a lawful and appropriate expression of opinion protected under the First Amendment of the United States Constitution." Consequently, the hearing judge determined that Gansler had not violated MRPC 8.2.

Finally, the hearing judge concluded that Bar Counsel had not demonstrated that Gansler violated MRPC 3.1 or MRPC 3.8(a) by making comments regarding his intended prosecution of youths suspected of making bomb threats. The judge

---

11. The hearing judge stated that she reached this conclusion "with reluctance" and that she was "troubled by such statements made by an elected State's Attorney prior to trial."

was persuaded by Gansler's hearing testimony that "his intent was not to prosecute in bad faith" but, rather, to stress that "the State often must try cases difficult to prove." Specifically finding Gansler's testimony credible, the hearing judge concluded that Bar Counsel had not presented clear and convincing evidence that Gansler intended to prosecute without probable cause in violation of MRPC 3.1 and MRPC 3.8(a).

As we noted earlier, both parties filed exceptions to the hearing judge's conclusions. Bar Counsel maintained that the hearing judge's finding of a single violation was in error and that the evidence clearly and convincingly supported a conclusion that Gansler violated MRPC 3.6 on numerous occasions. In addition, Bar Counsel argued that Gansler intended to prosecute without probable cause, in violation of MRPC 3.1, MRPC 3.8, and MRPC 8.4(d). Bar Counsel, however, took no exception from the hearing judge's conclusion that Gansler did not violate MRPC 8.2. Gansler found no fault with most of the hearing judge's findings and conclusions, except, however, for her determination that his comments regarding the plea offer to Perry had violated MRPC 3.6.

### III. Standard of Review

Our recent opinion in *Attorney Grievance Comm'n v. Zdravkovich*, 375 Md. 110, 126, 825 A.2d 418, 427 (2003), iterated our well established and frequently recognized standard of review in attorney disciplinary matters:

> This Court exercises " 'original and complete jurisdiction for attorney disciplinary proceedings in Maryland,' and conducts 'an independent review of the record.' " *Attorney Grievance Comm'n v. Blum*, 373 Md. 275, 293, 818 A.2d 219, 230 (2003) (quoting *Attorney Grievance Comm'n v. McLaughlin*, 372 Md. 467, 492, 813 A.2d 1145, 1160 (2002) (citations omitted)). "In conducting that review, we accept the hearing judge's findings of fact as *prima facie* correct unless shown to be 'clearly erroneous,' and we give due regard to the hearing judge's opportunity to assess the credibility of witnesses." *Attorney Grievance Comm'n v. Wallace*, 368 Md. 277, 288, 793 A.2d 535, 542 (2002) (citation

omitted). "As to the hearing judge's conclusions of law," however, " 'our consideration is essentially *de novo.*' " *Attorney Grievance Comm'n v. Dunietz,* 368 Md. 419, 428, 795 A.2d 706, 711 (2002) (quoting *Attorney Grievance Comm'n v. Thompson,* 367 Md. 315, 322, 786 A.2d 763, 768 (2001) (quoting *Attorney Grievance Comm'n v. Briscoe,* 357 Md. 554, 562, 745 A.2d 1037, 1041 (2000))).

## IV. Discussion

### A. MRPC 3.6

This case serves as this Court's first opportunity to consider the application of MRPC 3.6, the rule of professional responsibility governing trial publicity. More significant than the case's novelty, however, are the balance and interplay of the numerous interests, rights, and responsibilities involved. To provide the proper context for understanding the important issues presented, we begin with a historical discussion of the regulation of trial publicity. We then proceed to dissect Maryland's present rule and apply it to the extrajudicial statements in controversy.

#### 1. Origins of the MRPC 3.6

Criminal justice must be carried out in the courtroom.[12] As Justice Holmes declared in *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879, 881 (1907), "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." The constitutional underpinnings for this concept reside in the Sixth Amendment's right to a fair trial, made applicable to our State through the Fourteenth Amendment.[13] *Ristaino v. Ross,* 424 U.S. 589, 595 n. 6, 96

---

12. For extended discussions of the origin and historical development of the modern rules governing trial publicity, see Charles W. Wolfram, Modern Legal Ethics at 633–34 (1986); Alberto Bernabe-Riefkohl, *Silence is Golden: The New Illinois Rules on Attorney Extrajudicial Speech,* 33 Loy. U. Chi. L.J. 323 (2002).

13. U.S. Const. amend. VI provides:

S.Ct. 1017, 1020 n. 6, 47 L.Ed.2d 258, 263 n. 6 (1976) ("A criminal defendant in a state court is guaranteed an "impartial jury" by the Sixth Amendment as applicable to the States through the Fourteenth Amendment.") (citing *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)); *see Estes v. Texas,* 381 U.S. 532, 540, 85 S.Ct. 1628, 1632, 14 L.Ed.2d 543, 549 (1965) (describing the right to a fair trial as "the most fundamental of all freedoms"). Article 21 of the Maryland Declaration of Rights also guarantees the right to a fair trial in all criminal prosecutions.[14]

■ The text of the Sixth Amendment makes clear that a fair trial consists of numerous components, including, but certainly not limited to, the rights of an accused to a public trial and impartial jury. These components alone, of course, do not necessarily ensure a fair trial, as Chief Justice Warren explained:

It has been held ... that the fundamental conception of a fair trial includes many of the specific provisions of the Sixth Amendment.... But it also has been agreed that neither the Sixth nor the Fourteenth Amendment is to be read formalistically, for the clear intent of the amendments is that these specific rights be enjoyed at a constitutional trial. In the words of Justice Holmes, even though "every

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

14. Article 21 of the Maryland Declaration of Rights provides:

That in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defence; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty.

form [be] preserved," the forms may amount to no "more than an empty shell" when considered in the context or setting in which they were actually applied.

*Id.* at 560, 85 S.Ct. at 1641, 14 L.Ed.2d at 560 (Warren C.J., concurring). Thus, even where a court has observed all of the Sixth Amendment formalities, it is possible for a defendant to be deprived of a fair trial if circumstances occurring outside the courtroom taint the proceedings. *See Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (holding that a defendant's fundamental due process rights had been violated because a local television station had broadcasted his confession, and he was denied a change of venue).

One outside circumstance that may affect a defendant's right to a fair trial and, specifically, his right to an impartial jury, occurs when an attorney makes a publicized, out-of-court statement about the defendant's case. This is particularly true because attorneys occupy a special role as participants in the criminal justice system, and, as a result, the public may view their speech as authoritative and reliable. Attorneys involved in a particular case have greater access to information through discovery, the ability to converse privately with knowledgeable witnesses, and an enhanced understanding of the circumstances and issues. Their unique role and extensive access to information lends a degree of credibility to their speech that an ordinary citizen's speech may not usually possess. Comments by prosecuting attorneys, in particular, have the inherent authority of the government and are more likely to influence the public. When such seemingly credible information reaches the ears or eyes of the public, the jury pool may become contaminated, greatly diminishing the court's ability to assemble an impartial jury. The defendant's right to a fair trial, thus, may be compromised. *See* Joan C. Bohl, *Extrajudicial Attorney Speech and Pending Criminal Prosecutions: The Investigatory Commission Meets A.B.A. Model Rule 3.6,* 44 KAN. L.REV. 951, 973–74 (1996) (discussing how attorney speech differs from the speech of other individuals).

Limiting extrajudicial attorney speech to preserve a fair trial, however, can be accomplished only in a way that is consistent with the fundamental right to free expression under the First Amendment. In general, the First Amendment applies equally to an ordinary citizen and an attorney, as long as the attorney "plays no lawyerly role in the matter under comment." *See* Charles W. Wolfram, Modern Legal Ethics at 632 (1986). On the other hand, when the attorney has some professional relationship to a matter, the attorney's freedom to speak about it is not as broad. For instance, inside the courtroom, the rules of evidence and principles of relevance place rigid restrictions upon what an attorney may say, and when and how he or she may speak. Even outside the courtroom, the speech of a lawyer may be curtailed to an extent greater than an ordinary citizen's. In the arena of attorney advertising, the Supreme Court has upheld a state's thirty-day waiting period for solicitation letters by plaintiffs' personal injury lawyers, *see Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995), and a state's ban on in-person attorney solicitations, *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978).

In 1908, the American Bar Association first attempted to control the ill effects of attorney-generated trial publicity through the development of professional standards entitled "Canons of Professional Ethics" (hereinafter the "ABA Canons"). Many states adopted the ABA Canons, including Canon 20, which "[g]enerally ... condemned" newspaper publications "by a lawyer" regarding a pending case because such publications "may interfere with a fair trial in the Courts and otherwise prejudice the due administration of justice." [15] *See*

---

**15.** The full text of Canon 20 stated:

Newspaper publications by a lawyer as to pending or anticipated litigation may interfere with a fair trial in the Courts and otherwise prejudice the due administration of justice. Generally they are to be condemned. If the extreme circumstances of a particular case justify a statement to the public, it is unprofessional to make it anonymously. An *ex parte* reference to the facts should not go beyond quotation

*Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1066, 111 S.Ct. 2720, 2740, 115 L.Ed.2d 888, 918 (1991); Alberto Bernabe–Riefkohl, *Silence is Golden: The New Illinois Rules on Attorney Extrajudicial Speech,* 33 LOY. U. CHI. L.J. 323, 331 (2002) (hereinafter Bernabe–Riefkohl). The Maryland State Bar Association formally adopted the ABA Cannons in 1922. *Canons of Ethics, Adopted by the Maryland State Bar Association, Annual Session 1922* at 1.

Despite the widespread adoption of the ABA Canons, trial publicity continued to affect defendants' Sixth Amendment rights and, consequently, gained the attention of the Supreme Court during the 1950s and 1960s. The Court dealt with the detriments of excessive media involvement in cases by reversing a number of criminal convictions on the ground that excessive trial publicity deprived the defendants of due process. *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (holding that a defendant had been denied due process because a pre-trial hearing had been televised live and then rebroadcast, and because the court proceedings had been disrupted by the presence of the media); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (reversing a conviction after the defendant had been denied a change of venue even though a local television station had broadcast his recorded confession three times, and 106,000 of the estimated 150,000–person community viewed the broadcast); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (reversing a conviction where pre-trial publicity distributed in the vicinity of the trial included, *inter alia,* media accounts of the defendant's juvenile record, the confessions to several murders, and previous court-martial proceedings); *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (reversing a conviction because seven of twelve jurors had been exposed to news accounts of evidence that was not admitted at trial).

---

form the records and papers on file in the court; but even in extreme cases it is better to avoid any *ex parte* statement.

The leading case during this era, which identified the need for trial publicity reform and shaped the American Bar Association's (hereinafter "ABA") remedial measures, was *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). There, the Court, on due process grounds, reversed the murder conviction of Sam Sheppard, whose high-profile trial had been preceded and pervaded by a media frenzy. *Id.* at 363, 86 S.Ct. at 1522–23, 16 L.Ed.2d at 621. Newspapers had documented Sheppard's alleged refusal to cooperate with investigating officials and had published articles discussing incriminating evidence that was never admitted at trial. *Id.* at 338–41, 86 S.Ct. at 1509–11, 16 L.Ed.2d at 606–08. During trial, members of the media frequently moved in and out of the courtroom, causing so much noise and confusion that it became difficult to hear lawyers and witnesses. *Id.* at 344, 86 S.Ct. at 1513, 16 L.Ed.2d at 610. Furthermore, reporters had crowded the defense table at trial, making it very difficult for Sheppard to have private discussions with his counsel. *Id.* Despite the chaotic conditions, the trial judge refused to allow a change of venue and failed to take steps to control the adverse effects of the publicity. *Id.* at 354 n. 9, 358–59, 86 S.Ct. at 1518 n. 9, 1520, 16 L.Ed.2d at 615 n. 9, 618.

The Supreme Court admonished the trial court in *Sheppard* for its failure to control the extrajudicial publicity:

> The fact that many of the prejudicial news items can be traced to the prosecution, as well as the defense, aggravates the judge's failure to take any action. Effective control of these sources—concededly within the court's power—might well have prevented the divulgence of inaccurate information, rumors, and accusations that made up much of the inflammatory publicity....

*Id.* at 361, 86 S.Ct. at 1521, 16 L.Ed.2d at 619. The Court suggested how the trial judge could have minimized the prejudicial publicity, including proscribing extrajudicial statements by lawyers and other trial participants, requesting local officials to implement regulations with respect to the dissemination of trial information, and warning news media about the impropriety of publicizing material not introduced at the pro-

ceeding. *Id.* at 361–62, 86 S.Ct. at 1521–22, 16 L.Ed.2d at 619–20. Emphasizing the prejudicial effect of news media on fair trials, the Court iterated:

> Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused.... [W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue until the threat abates, or transfer it to another county not so permeated with publicity.

*Id.* at 362–63, 86 S.Ct. at 1522, 16 L.Ed.2d at 620. Moreover, the Court recognized that repeatedly reversing convictions would not suffice as a long-term remedy for the harm of trial publicity. The Court recommended an alternative solution:

> But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but it is highly censurable and worthy of disciplinary measures.

*Id.* at 363, 86 S.Ct. at 1522, 16 L.Ed.2d at 620.

In response to *Sheppard* and as a culmination of four years of meetings by a committee appointed by the ABA to develop standards to regulate the criminal justice system, the ABA in 1968 introduced Standards Relating to Fair Trial and Fair Press (hereinafter the "ABA Standards"). ABA STANDARDS FOR CRIMINAL JUSTICE FAIR TRIAL AND FREE PRESS ix (3rd ed.1991). ABA Standard 1–1, which merely set aspirational

goals for lawyers, stated that it was a "duty" of a lawyer to prevent the "release" of information for "dissemination" that is reasonably likely to interfere with a fair trial.[16] In addition, the ABA included a disciplinary rule related to trial publicity in its newly proposed Model Code of Professional Responsibility of 1969 (hereinafter "ABA Model Code of 1969"). Bernabe–Riefkohl at 337. Disciplinary Rule 7–107 of the ABA Model Code of 1969 established a detailed set of mandatory guidelines to be used by lawyers considering the propriety of extrajudicial statements. *Id.* The guidance of Rule 7–107 differed depending on the stage of the case and the nature of the proceeding, but it generally banned all extrajudicial statements that had a "reasonable likelihood" of interfering with a trial or prejudicing the administration of justice. In 1970, Maryland adopted the ABA Model Code of 1969 verbatim and in its entirety.

In 1983, the ABA again proposed a new model code in an effort to address concerns that the "reasonable likelihood" standard of ABA Standard 1-1 and Disciplinary Rule 7–107 might not meet the requirements of the First Amendment. *See Chi. Council of Lawyers v. Bauer,* 522 F.2d 242 (7th Cir.1975), *cert. denied sub nom., Cunningham v. Chi. Council of Lawyers,* 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976) (holding that a local criminal rule nearly identical to ABA Standard 1-1 and similar to Disciplinary Rule 7–107 violated the First Amendment as a vague and overbroad restriction on speech). Rule 3.6 of the Model Rules of Professional Conduct (hereinafter the "ABA Model Rules") attempted to regulate trial publicity in a way that constitutionally balanced the lawyers' right to free expression and an accused's

---

**16.** ABA Standard 1-1 provided:

> It is the duty of the lawyer not to release or authorize the release of information or opinion for dissemination by any means of public communication in connection with pending or imminent criminal litigation with which he is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

ABA Advisory Comm. of Fair Trial and Free Press, Standards Relating to Fair Trial and Free Press, Standard 1-1 (1969).

right to a fair trial.[17] MRPC 3.6, which first appeared in the Maryland Rules in 1986 and presently governs trial publicity in Maryland, is identical to this initial version of ABA Model Rule 3.6.

### 2. The Structure and Operation of MRPC 3.6

MRPC 3.6 has three subsections, which all operate together to give the rule its full meaning. Subsection (a) announces a general prohibition against lawyers making extrajudicial statements that "the lawyer knows or reasonably should know . . . will have a substantial likelihood of materially prejudicing an adjudicative proceeding." This prohibition applies, however, only to those statements that a reasonable person "would expect to be disseminated by means of public communication."

Subsection (b) provides examples of the types of extrajudicial statements that would have "a substantial likelihood of materially prejudicing an adjudicative proceeding." Under subsection (b), statements are prohibited that "ordinarily [are] likely" to include references to criminal matters that relate to, among other things, the criminal record of a party, the possibility of a plea of guilty, the existence or contents of any confession, admission, or statement by a defendant, or any opinion as to the guilt or innocence of a defendant.

---

**17.** The first paragraph of the Comment to ABA Rule 3.6 describes that delicate balancing act:

> It is difficult to strike a balance between protecting the right to a fair trial and safeguarding the right of free expression. Preserving the right to a fair trial necessarily entails some curtailment of the information that may be disseminated about a party prior to trial, particularly where trial by jury is involved. If there were no such limits, the result would be the practical nullification of the protective effect of the rules of forensic decorum and the exclusionary rules of evidence. On the other hand, there are vital social interests served by the free dissemination of information about events having legal consequences and about legal proceedings themselves. The public has a right to know about threats to its safety and measures aimed at assuring its security. It also has a legitimate interest in the conduct of judicial proceedings, particularly in matters of general public concern. Furthermore, the subject matter of legal proceedings is often of direct significance in debate and deliberation over questions of public policy.

Subsection (c) states, however, that circumstances exist where an attorney, without risking discipline, may make extrajudicial statements that fall under subsections (a) and (b). The provisions under subsection (c) are known as "safe harbors." *See Gentile,* 501 U.S. at 1033, 111 S.Ct. at 2723, 115 L.Ed.2d at 897 (describing the provisions of Nevada Supreme Court Rule 177(3), which are substantively identical to MRPC 3.6(c), as "safe harbors"). For example, an attorney may disclose, through extrajudicial statements and "without elaboration," "the scheduling or result of any step in litigation," even if that information, in some way, would have a "substantial likelihood of materially prejudicing an adjudicative proceeding." MRPC 3.6(c)(4). Another such "safe harbor" permits attorneys to comment outside the courtroom and without elaboration on "information contained in a public record." MRPC 3.6(c)(2).

### 3. Gansler's Extrajudicial Statements Applied to MRPC 3.6

In the case before us, Bar Counsel argues that Gansler violated MRPC 3.6 by making extrajudicial statements related to the Cook, Lucas, and Perry cases. Gansler asserts, however, that his statements in these cases fall under the "public record" exception under the safe harbor provisions of MRPC 3.6(c). In addition, Gansler claims that the safe harbor provisions do not provide sufficient guidance as to what information is contained in the "public record," so he was incapable of determining which statements actually would constitute violations.

The issues in this case are similar to those discussed by the Supreme Court in *Gentile.* In a fractured opinion, the Court held that Nevada Supreme Court Rule 177, a rule substantively identical to MRPC 3.6, had been unconstitutionally applied to discipline a defense lawyer for making extrajudicial statements that professed his client's innocence in a criminal case. *Id.* at 1033, 111 S.Ct. at 2723, 115 L.Ed.2d at 897. Chief Justice Rehnquist authored the portion of the majority opinion analyzing the "substantial likelihood of material prejudice"

standard of Rule 177, and Justice Kennedy represented the majority of the Court in striking down Nevada's application of Rule 177 as unconstitutionally vague.

Nevada's rule, like Maryland's, prohibited an attorney from making extrajudicial statements that have a "substantial likelihood of materially prejudicing an adjudicative proceeding." Gentile, the Nevada attorney challenging the rule, argued that this standard infringed upon an attorney's right to free speech as guaranteed by the First Amendment to the United States Constitution. The State Bar of Nevada, arguing in favor of the standard, emphasized the State's interest in maintaining fair trials that are decided in the courtroom and not through the use of "the meeting-hall, the radio, and the newspaper." *Id.* at 1070, 111 S.Ct. at 2742, 115 L.Ed.2d at 920 (quoting *Bridges v. California,* 314 U.S. 252, 271, 62 S.Ct. 190, 197, 86 L.Ed. 192, 208 (1941)).

In analyzing the parties' arguments, the Court acknowledged that the First Amendment permitted States to regulate attorney speech more stringently than the speech of an ordinary citizen. *Id.* at 1071, 111 S.Ct. at 2743, 115 L.Ed.2d at 921. The Chief Justice explained the State's particular interest in restricting speech of a lawyer involved in a pending case:

> Lawyers representing clients in pending cases are key participants in the criminal justice system, and the State may demand some adherence to the precepts of that system in regulating their speech as well as their conduct. As noted by Justice Brennan in his concurring opinion in *Nebraska Press,* which was joined by Justices Stewart and Marshall, "as officers of the court, court personnel and attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice." Because lawyers have special access to information through discovery and client communications, their extrajudicial statements pose a threat to the fairness of a pending proceeding since lawyers' statements are likely to be received as especially authoritative.

*Id.* at 1074, 111 S.Ct. at 2744–45, 115 L.Ed.2d at 923 (citation omitted). The Court concluded that the "substantial likelihood of material prejudice standard constitutes a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the State's interest in fair trials." *Id.* at 1075, 111 S.Ct. at 2745, 115 L.Ed.2d at 923 (internal quotations omitted).

The Court also subjected the "substantial likelihood" standard under Rule 177 to traditional First Amendment scrutiny, requiring that content-based speech regulation be necessary to achieve a legitimate state interest. *Id.* The Court stated:

> The "substantial likelihood" test embodied in Rule 177 is constitutional under this analysis, for it is designed to protect the integrity and fairness of a State's judicial system, and it imposes only narrow and necessary limitations on lawyers' speech. The limitations are aimed at two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found. Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by "impartial" jurors, and an outcome affected by extrajudicial statements would violate that fundamental right. Even if a fair trial can ultimately be ensured through *voir dire,* change of venue, or some other device, these measures entail serious costs to the system. Extensive *voir dire* may not be able to filter out all of the effects of pretrial publicity, and with increasingly widespread coverage of criminal trials, a change of venue may not suffice to undo the effects of statements such as those made by [Gentile]. The State has a substantial interest in preventing officers of the court, such as lawyers, form imposing such costs on the judicial system and on the litigants.

*Id.* at 1075, 111 S.Ct. at 2745, 115 L.Ed.2d at 923–24 (citations omitted). The Court concluded that the "substantial likelihood" standard was narrowly tailored to protect these State interests. *Id.* at 1076, 111 S.Ct. at 2745, 115 L.Ed.2d at 924. This was so because the restraint on attorney speech was

limited—"it applies only to speech that is substantially likely to have a materially prejudicial effect; it is neutral as to points of view, applying equally to all attorneys participating in a pending case; and it merely postpones the attorneys' comments until after trial." *Id.*

In addition to upholding the "substantial likelihood" standard on its face, the *Gentile* Court also considered the constitutionality of Nevada's application of Rule 177. The Nevada Supreme Court had imposed a sanction against Gentile for making extrajudicial statements labeling the alleged victims in the criminal case as "drug dealers" and "money launderers," blaming the alleged crime on the police, calling into question the police's motives for levying the criminal charges against his client, and proclaiming the innocence of his client. *Id.* at 1078–79, 111 S.Ct. at 2747, 115 L.Ed.2d at 925–26. Gentile had testified at his disciplinary hearing that he believed his statements were protected by Rule 177(3)(a), one of Rule 177's "safe harbors," which allowed an attorney to comment outside of the courtroom and "without elaboration" on the "general nature of the ... defense," even if the lawyer "knows or reasonably should know that [the statement] will have a substantial likelihood of materially prejudicing an adjudicative proceeding." *Id.* at 1048–49, 111 S.Ct. at 2731, 115 L.Ed.2d at 907.

A majority of the Justices, led by Justice Kennedy, decided that, "[a]s interpreted by the Nevada Supreme Court, [Rule 177] is void for vagueness ... for its safe harbor provision, Rule 177(3), misled [Gentile] into thinking that he could give his press conference without fear of discipline." The Court described its reasoning:

> Given [the Rule's] grammatical structure, and absent any clarifying interpretation by the state court, the Rule fails to provide "fair notice to those to whom [it] is directed." *Grayned v. City of Rockford,* 408 U.S. 104, 112, 92 S.Ct. 2294, 2301, 33 L.Ed.2d 222, 230 (1972). A lawyer seeking to avail himself of Rule 177(3)'s protection must guess at its contours. The right to explain the "general" nature of the defense without "elaboration" provides insufficient guidance

because "general" and "elaboration" are both classic terms of degree. In the context before us, these terms have no settled usage or tradition of interpretation in law. The lawyer has no principle for determining when his remarks pass from the safe harbor of the general into the forbidden sea of the elaborated.

*Id.* at 1048–49, 111 S.Ct. at 2731, 115 L.Ed.2d at 906–07. The Court further declared that, without providing sufficiently precise guidance, Rule 177 "creates a trap" even for the lawyers who study the rule and make a conscious effort to comply with it. *Id.* at 1051, 111 S.Ct. at 2732, 115 L.Ed.2d at 908. Finally, Rule 177(3)(a) was "so imprecise" that, in the Court's view, it created an "impermissible risk of discriminatory enforcement."

The case before us involves the application of a different safe harbor, MRPC 3.6(c)(2), which refers to "information contained in a public record." This provision suffers from constitutional infirmities similar to those of Nevada's Rule 177(3)(a).[18] The text of MRPC 3.6(c)(2) provides that an attorney may make extrajudicial statements "without elaboration" concerning "information contained in a public record." These protections lack a clarifying interpretation by this Court, and the term "elaboration," a classic term of degree, has no settled usage or tradition of interpretation in law.

The phrase "information contained in a public record" also does not provide sufficient guidance for determining which statements were protected under MRPC 3.6(c)(2). As evidenced by the widely disparate meanings for "public record" that the parties' experts in this case have advanced, the term, standing alone, can be subject to multiple interpretations even

---

**18.** Following the Supreme Court's decision in *Gentile*, the American Bar Association amended ABA Rule 3.6. The amendments deleted "without elaboration" and "general" from the text of the Rule to address the Court's concern over those terms. *See A Legislative History: The Development of the ABA Model Rules of Professional Conduct, 1982–1998*, at 196 (1999); *Annotated Model Rules of Professional Conduct*, at 357 (1999). MRPC 3.6, however, has not changed since its first promulgation in 1986.

by lawyers well educated on this specific principle of professional responsibility. Gansler and Professor Lerman define "information in a public record" broadly as "anything that has been filed in court ... and anything that has been otherwise made public." Bar Counsel and Professor Dash offer a narrower interpretation, suggesting that "the public record exception applies to that formal information in the public domain that exists *prior to, or separate from,* the investigation and prosecution of the subject criminal matter." (emphasis added). Bar Counsel, however, has provided no authority to support its interpretation and, in fact, concedes that the term "does not appear to have been the subject of judicial scrutiny and little guidance is afforded. . . ."

"Public record" has been defined in other contexts, as the hearing judge recognized in her report, but those definitions also fail to provide uniform guidance. Maryland Code, § 10–611(g)(1) of the State Government Article (1984, 1999 Repl. Vol.), sets forth one definition for purposes of the Public Information Act:

(g) *Public Record.*—(1) "Public record" means the original or any copy of any documentary material that:

(i) is made by a unit or instrumentality of the State government or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business; and

(ii) is in any form, including:

1. a card;
2. a computerized record;
3. correspondence;
4. a drawing;
5. film or microfilm;
6. a form;
7. a map;
8. a photograph or photostat;
9. a recording; or
10. a tape.

The Maryland Code provides a different definition of "public record" in Section 8–606(a)(3) of the Criminal Law Article. That section states:

(3) "Public Record" includes an official book, paper, or record, kept on a manual or automated basis, that is created, received, or used by a unit of:

(i) the State;

(ii) a political subdivision of the State; or

(iii) a multicounty agency.

The Maryland Rules describe "public record" in still a different way. Maryland Rule 5–803(b)(8)(A) defines "public records and reports" for purposes of the "public records" exception to the hearsay rule, as including:

a memorandum, report, record, statement, or data compilation made by a public agency setting forth (i) the activities of the agency; (ii) masters observed pursuant to a duty imposed by law, as to which matters there was a duty to report; or (iii) in civil actions and when offered against the State in criminal actions, factual finding resulting from an investigation made pursuant to authority granted by law.

Another source, Black's Law Dictionary, defines "public record" as "[a] record that a governmental unit is required by law to keep, such as land deeds kept at a county courthouse." BLACK'S LAW DICTIONARY 1279 (7th ed.1999). These characterizations of "public record" contemplate only information that has been created or distributed by a government entity.

Not all sources, however, consider "public record" to be a reference to materials produced by any government entity. Although Canon 20 of the 1908 ABA Canons of Ethics did not use the phrase "information contained in a public record," its terms do furnish some instruction as to the meaning of the phrase. Canon 20 prohibited "*ex parte* reference" to the facts of a case "beyond quotation from the *records and papers on file in the court.*" (emphasis added). Similarly, Local Rule 204 of the United States District Court for the District of Maryland prohibits an attorney from making certain extrajudicial statements after the arrest of an accused, except that the

lawyer may quote from or refer to without comment to "public Court records" in the case. Thus, according to some sources, "public records" are limited to the exact information contained in documents on file with the court.

Because there is no settled definition of "information contained in a public record" we agree with Gansler that MRPC 3.6(c)(2) does not provide adequate guidance for determining which extrajudicial statements would qualify under the safe harbor. For this reason, we construe the phrase in its broadest form as applied to Gansler in this case and to any other extrajudicial statements made prior to the filing of this Opinion. In this case, we consider "information in a public record" to include anything in the public domain, including public court documents, media reports, and comments made by police officers.

Under this broad interpretation, it is clear that a number of Gansler's extrajudicial statements do not warrant discipline, as the hearing judge determined. Gansler did not violate MRPC 3.6 by commenting on the sneaker print matches in Cook's case because, shortly before Gansler's extrajudicial comments, a television reporter had broadcast an account of that evidence nearly mirroring Gansler's version. Additionally, in the Lucas case, Gansler made statements to the media about a shoe print at the crime scene that matched shoes Lucas had been observed wearing. This information was already public as recorded in the statement of charges filed by the police the day before. Also contained in the statement of charges was an account of Lucas's admission to police that he broke into the church rectory and murdered Monsignor Wells. Therefore, the next day, when Gansler relayed information about the admission to the media, he revealed "information contained in a public record." We overrule Bar Counsel exceptions as they relate to Gansler's extrajudicial statements about physical evidence in the Cook and Lucas cases as well as the confession in the Lucas case.

Gansler argues that the "public record" safe harbor also should protect his reference to Lucas's history of convic-

tions. MRPC 3.6(b)(1) informs lawyers that extrajudicial statements relating to the "criminal record of a party" are ordinarily likely to be intolerably prejudicial. Nevertheless, during the June 18, 2003 press conference announcing the arrest of Lucas, Gansler mentioned that Lucas "has a criminal record which includes residential burglaries." To support his assertion that this statement should be protected by the "public record" safe harbor, Gansler points to Deputy State's Attorney Winfree's testimony, characterizing Lucas's prior arrest and conviction record as "part of the public record."

Based on this testimony, we hold that Gansler's reference to Lucas's criminal record falls under our broad definition of "information in a public record." We reach this result because we have inferred from Deputy State's Attorney Winfree's testimony that she was referring to publicly accessible court records in Maryland, either case files or docket sheets, which indicate that an individual has been convicted of a crime. Maryland law does not bar an ordinary citizen from combing these court documents to learn information about someone's criminal history. For this reason, Lucas's history of convictions could have existed in the public domain before Gansler spoke of it. Under the circumstances of this case, the extrajudicial reference to Lucas's convictions qualifies for the protection of the "public record" safe harbor, as we have broadly defined it for this Opinion. Because of the strong prejudicial impact of the public disclosure of criminal record information, future respondents will have the burden of establishing that such information was contained in a bona fide public court record accessible to the general public.[19]

---

19. Not all criminal record information would qualify as "information in a public record," even if the term is defined broadly. Some information relating to an individual's criminal history, such as that collected by the Criminal Justice Information System (hereinafter "CJIS"), may not appear in a case file or docket sheet or otherwise have reached the public domain. The CJIS Central Repository compiles and maintains data of an individual's history of arrests, convictions, and other adverse criminal actions, but CJIS strictly limits access to its data. *See* Maryland Code, § 10–213 of the Criminal Procedure Article (2001); COMAR 12.15.01.08—12.15.01.13 (2003). An ordinary citizen may not obtain

 Additionally, lawyers who make extrajudicial statements in the future will not find shelter in the broad definition of MRPC (c)(2) that we apply here. Public policy mandates a more limited definition of "information in a public record." We believe that, to best "protect[ ] the right to a fair trial and safeguard[ ] the right of free expression," the phrase "information in a public record" should refer only to public government records—the records and papers on file with a government entity to which an ordinary citizen would have lawful access.

 To receive the protection of the "public record" safe harbor, the lawyer must not provide information beyond quotations from or references to public government records. The definition we establish in this case prevents attorneys from side-stepping the rule by directing or encouraging individuals not bound by the MRPC to publicize information so that attorneys can speak freely about it. Furthermore, by strictly limiting what is considered a public record, this definition enables all of the components of MRPC 3.6 to filter objectionable publicity, preventing the "public record" exception from swallowing the general rule of restricting prejudicial speech.

In any event, no matter whether one defines "information in a public record" broadly to include everything in the public domain or narrowly, Gansler violated the MRPC 3.6 by making several extrajudicial statements at issue in this case. Initially, we must point out that Gansler has not challenged

---

criminal history information from CJIS without demonstrating convincingly that the purpose of requesting the data meets one of CJIS's narrow exceptions (e.g., an employer who is seeking background information on a prospective employee whose job could "jeopardize the life and safety of individuals"). COMAR 12.15.01.13. As a result, the CJIS report is not public.

This non-public criminal history information collected by CJIS, of course, may overlap with information contained in publicly accessible case files and docket entries. If that should occur, the overlapping criminal record information would be considered part of the public government records, and statements referring to that particular information would receive protection under the "public record" safe harbor. The converse is also true; if an extrajudicial statement refers to criminal history information obtainable only from a non-public source like CJIS, the "public record" safe harbor would not apply.

that his comments qualify, under MRPC 3.6(a), as statements that "a reasonable person would expect to be disseminated by means of public communication." The only contested issues in this case concern whether Gansler knew or should have known that his statements would have a substantial likelihood of materially prejudicing an adjudicative proceeding and whether the statements are protected under the safe harbor provisions of MRPC 3.6(c). As we discuss in detail below, Gansler did violate MRPC 3.6 by commenting on Cook's confession, by discussing the plea offer to Perry, and by providing his opinion as to the guilt of Cook and Lucas.

■■■■■■ First, Gansler violated MRPC 3.6 by discussing Cook's confession to the Stottsmeister murder. MRPC 3.6(b)(2) provides that a statement relating to the "existence or contents of any confession, admission, or statement given by a defendant" is "ordinarily likely" to have a "substantial likelihood of materially prejudicing an adjudicative proceeding." Notwithstanding the cautionary language of the rule and prior to the filing of murder charges, Gansler publicly stated that police were able to obtain a confession from Cook. Apparently seeking shelter again under the "public record" safe harbor, Gansler points out that his reference to "incredible details" mirrored the information and even the language of the charging document. This observation fails to acknowledge that officials did not file the statement of charges against Cook until *after* the press conference. The "public record" safe harbor, whether construed narrowly or broadly, could not apply possibly to any statement that introduced information to the public for the first time. Gansler should have known that these statements, by themselves, would prejudice Cook in the public's eye.

Not only did Gansler announce the existence of Cook's confession, but he also furnished specific information of the surrounding circumstances, including that Cook provided "incredible details that only the murderer would have known." Gansler magnified the prejudicial effect of his statements by bolstering the believability of the confession. He stated that,

before Cook traveled to the crime scene and "went over in detail by detail every step of" the murder, the police had provided him with a restful night's sleep. If we found no fault with such public disclosures, we would be allowing attorneys, in effect, to evade the operation of the exclusionary rule by taking advantage of the probative value of the confession without regard to its constitutionality or admissibility as evidence. That is, Gansler made Cook's confession public even though its contents might never reach the jury as a result of a constitutional challenge. His actions, in this regard, run afoul of our principles of criminal justice, as Chief Justice Rehnquist illustrated:

> The outcome of a criminal trial is to be decided by impartial jurors, who know as little as possible of the case, based on material admitted into evidence before them in a court proceeding. Extrajudicial comments on, or discussion of, evidence which might never be admitted at trial and *ex parte* statements by counsel giving their version of the facts obviously threaten to undermine this basic tenet.

*Gentile,* 501 U.S. at 1070, 111 S.Ct. at 2742, 115 L.Ed.2d at 920. Accordingly, with respect to Gansler's remarks on the Cook confession, we sustain Bar Counsel's exception because Gansler knew or should have known that his announcement would have a substantial likelihood of causing material prejudice.[20]

Gansler also committed a violation of MRPC 3.6, as Judge Stevenson concluded, by commenting extrajudicially on the matter of Perry's plea bargain. MRPC 3.6(b)(2) states that a statement is "ordinarily likely" to have a substantial likelihood of materially prejudicing an adjudicative proceeding

---

**20.** We observe that, prior to Gansler's comments at the Cook press conference, a television reporter noted that Cook had confessed and Captain Bernie Forsythe mentioned in his comments to the press that investigators had obtained a confession from Cook. The reporter and Captain Forsythe limited their comments to the existence of the confession and offered no additional information about it. Gansler's statements, however, as we noted above, provided a great deal of specific information that had not been disclosed.

if the statement relates to "the possibility of a plea of guilty to the offense." Gansler's reported statement in April of 2000 disclosed, for the first time, his decision "to offer [Perry] a plea bargain."

■ Gansler argues, though, that his comments to the *Gazette* about the plea offer should be covered by the "public record" safe harbor because the public already knew of his conversations with the victims' family members, in which they were consulted about whether to retry Perry or plea bargain. The public's general knowledge about plea bargains and how they normally play a part in every prosecution does not equate, however, to the public having actual knowledge that a plea bargain would be offered in this particular case. The decision to offer a plea bargain does not qualify as "information contained in a public record," even under the broadest meaning of that phrase.

Besides announcing the plea offer, Gansler also discussed the impending deadline for Perry to accept that offer, all during a very public and controversial prosecution of a multiple murder suspect. Public comments such as these place greater pressure on the defendant to accept the plea offer. More importantly, the comments likely influenced potential jurors in Perry's case by communicating that the lead prosecutor believed the defendant was guilty. *See* John Wesley Hall, Jr., Professional Responsibility of the Criminal Lawyer § 12.16 (2nd ed. 1996) ("Any ... statement [regarding the possibility of a plea of guilty] is, of course, a direct reference to an opinion of the speaker as to guilt of the accused or as to the belief of the accused as to his own guilt. It is tantamount to publication of an opinion as to guilt."). We, therefore, overrule Gansler's exception to Judge Stevenson's conclusion that the comments related to Perry's plea offer violated MRPC 3.6.

■ MRPC 3.6(b)(4) specifically addresses attorney comments discussing "any opinion as to the guilt or innocence of a defendant." Although several of Gansler's extrajudicial statements fall under this category of restricted speech and were

not covered by any safe harbor, the hearing judge determined that the evidence did not show that any "material prejudicial effect" stemmed from them. Gansler's statements, indicating that "they" had apprehended the person who committed the crimes in the Cook and Lucas cases, came soon after the defendants had been arrested and well before the eve of trial. This, coupled with the fact that neither Lucas's nor Cook's attorneys claimed that Gansler's statements caused prejudice, persuaded the hearing judge to conclude that Bar Counsel had not shown a substantial likelihood of material prejudice.

We disagree with the hearing judge's conclusion that the evidence failed to show that Gansler knew or should have known that his statements of opinion would have a substantial likelihood of material prejudice. In considering the propriety of a statement under MRPC 3.6, we determine the likelihood that a particular statement will cause prejudice at the time the statement was made, not whether that statement, in hindsight, actually worked to the detriment of a defendant. Whether Cook or Lucas claimed at their trials to be prejudiced by Gansler's statements, therefore, does not weigh in our analysis. Rather, we concentrate on the point in time when Gansler offered his public comments to determine the probability of prejudice.

According to the hearing judge, the point in time when Gansler made the extrajudicial statements minimized whatever prejudicial effect flowed from his remarks. As support for this conclusion, the hearing judge cited Part II of Justice Kennedy's minority opinion in *Gentile.* Justice Kennedy suggested that statements made well before a defendant's trial have less prejudicial impact than statements made closer to the empaneling of a jury. *Gentile,* 501 U.S. at 1044, 111 S.Ct. at 2729, 115 L.Ed.2d at 904 (Kennedy, J., dissenting). Gentile had made his controversial statements six months prior to voir dire, enough time, according to Justice Kennedy, for the content of the message to fade from the public's memory. *Id.* The timing of Gentile's statement, however, was not the only factor that Justice Kennedy considered in determining that no

prejudice had occurred in that case. He also analyzed the contents of Gentile's message, which, Justice Kennedy stated, "lack any of the more obvious bases for a finding of prejudice." *Id.* at 1046, 111 S.Ct. at 2730, 115 L.Ed.2d at 905.

We agree with Gansler's theory that the timing of an extrajudicial statement may affect its prejudicial effect, but we do not believe that the timing element in this case neutralizes the obvious prejudicial content of Gansler's statements of opinion. Like in *Gentile*, the timing of Gansler's statements came well before the beginnings of Cook's and Lucas's trials; however, Gansler's proclamation that "they" had apprehended the persons who committed the crimes in the Cook and Lucas cases directly contravened the provisions of MRPC 3.6(b)(4) (opinion on guilt of innocence). The comments blatantly expressed Gansler's opinion of the guilt of the defendants. In contrast to the lawyer in *Gentile*, who refused to comment on confessions and evidence from searches, *see Gentile*, 501 U.S. at 1046, 111 S.Ct. at 2730, 115 L.Ed.2d at 905 (Kennedy J., dissenting), Gansler supported his opinions of guilt by pointing to specific circumstances, such as confessions and physical evidence, to make his views more reliable.

*Gentile* differs from the case before us for yet another reason: Gansler is a prosecutor, not a defense lawyer. Prosecutors play a unique role in our system of criminal justice. We recognized this recently in *Walker v. State*, 373 Md. 360, 394–95, 818 A.2d 1078, 1098 (2003), where Judge Harrell for the Court stated:

Prosecutors are held to even higher standards of conduct than other attorneys due to their unique role as both advocate and minister of justice. The special duty of the prosecutor to seek justice is said to exist because the State's Attorney has broad discretion in determining whether to initiate criminal proceedings. *Brack v. Wells*, 184 Md. 86, 90, 40 A.2d 319, 321 (1944). The office of prosecutor is therefore "not purely ministerial, but involves the exercise of learning and discretion," and he or she "must exercise a sound discretion to distinguish between the guilty and the

innocent." *Id.* The responsibilities of the prosecutor encompass more than advocacy. The prosecutor's duty is not merely to convict, but to seek justice. "His obligation is to protect not only the public interest but the innocent as well and to safeguard the rights guaranteed to all persons, including those who may be guilty." *Sinclair v. State,* 27 Md.App. 207, 222–23, 340 A.2d 359, 369 (1975).

In addition to their special role as ministers of justice, prosecutors have limitations not experienced by criminal defense attorneys in that defense attorneys have the benefit of their client's presumption of innocence. In other words, a criminal defense attorney may announce an opinion that his or her client is innocent with a lesser risk of causing prejudice because the law, itself, presumes the defendant's innocence.

On the other hand, a prosecutor's opinion of guilt is much more likely to create prejudice, given that his or her words carry the authority of the government and are especially persuasive in the public's eye. *See* Scott M. Matheson, Jr., *The Prosecutor, The Press, and Free Speech,* 58 FORDHAM L.REV. 865, 886 (1990) ("When the prosecutor speaks publicly about a pending case, he cannot separate his representational role from his speech, and he thereby involves the state in the extrajudicial comment."). As lawyers, prosecutors are so distinct that some commentators have argued that the rules against extrajudicial statements should apply only to them. *See, e.g.,* Freedman & Starwood, *Prior Restraints on Freedom of Expression by Defendants and Defense Attorneys,* 29 STAN. L. REV. 607 (1977). Although we do not embrace this position, it nonetheless reinforces the notion that prosecutors, in particular, should be even more cautious to avoid making potentially prejudicial extrajudicial statements.[21] Because we hold that

---

21. We also observe that prosecutors, as public employees, may not speak publicly with the same broad freedom that ordinary citizens enjoy. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *DiGrazia v. County Exec. for Montgomery County,* 288 Md. 437, 418 A.2d 1191 (1980). This is so because, in the context of an employer and employee relationship, "the State has interests as an employer in regulating the speech of its employees that

Gansler knew or should have known that his public opinions of Cook's and Lucas's guilt would have a substantial likelihood of material prejudice, we sustain Bar Counsel's exception with respect to those statements.[22]

## B. MRPC 3.1, 3.8(a), and 8.4(d)

Bar Counsel excepted to the hearing judge's conclusion that Gansler did not violate MRPC 3.1, 3.8, and 8.4(d). The charges under these rules arose from two events: (1) Gansler's unsuccessful prosecution in District Court of two juveniles based on charges that they called bomb threats to a Montgomery County High School, and (2) Gansler's statements regarding his intention to prosecute "[j]uveniles who phone in bomb threats" even if "the case is not strong enough to warrant a conviction." Bar Counsel argues that by prosecuting the two juveniles with minimal evidence, Gansler brought a frivolous claim in violation of MRPC 3.1 and prosecuted a charge not supported by probable cause in violation of MRPC 3.8(a). Furthermore, in Bar Counsel's view, Gansler's violated MRPC 8.4(d) because the statements about future bomb-threat prosecutions communicated to the public that "someone acquitted of a crime was guilty nonetheless and warranted to be prosecuted. . . ." Gansler responds that he

---

differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734, 20 L.Ed.2d at 817. Our cases have acknowledged that public employees may be subjected to greater speech limitations by the State as a result of the State's interests as an employer. *Hawkins v. Dep't. of Public Safety & Corr. Servs.*, 325 Md. 621, 602 A.2d 712 (1992); *O'Leary v. Shipley*, 313 Md. 189, 199, 545 A.2d 17, 22 (1988); *De Bleecker v. Montgomery County*, 292 Md. 498, 507, 438 A.2d 1348, 1353 (1982); *DiGrazia*, 288 Md. at 449, 418 A.2d at 1198.

**22.** The hearing judge did not address the application of MRPC 8.4(a), which finds professional misconduct where a lawyer "violates or attempts to violate the Rules of Professional Conduct." We have held that a violations of a MRPC 1.15 and MRPC 1.4(a) "necessarily" result in a violation of MRPC 8.4(a) as well. *Attorney Grievance Comm'n v. Gallagher*, 371 Md. 673, 710–11, 810 A.2d 996, 1018 (2002). Likewise, we conclude in this case that Gansler's violation of MRPC 3.6 also constituted a violation of MRPC 8.4(a).

prosecuted the juveniles because he believed that they had committed a crime beyond a reasonable doubt. He contends that the judge's decision to acquit the juveniles represented only that she disagreed with his evaluation of the evidence, not that the prosecution lacked probable cause.

MRPC 3.1 prohibits attorneys from bringing frivolous suits, and MRPC 3.8(a) prohibits prosecutors from knowingly prosecuting a charge that is not supported by probable cause. Expressly addressing only the comments Gansler made, the hearing judge concluded that Bar Counsel had not presented clear and convincing evidence that Gansler "intended to prosecute in violation of [MRPC] 3.1 and [MRPC] 3.8(a)." Although she did not specifically address the issue in her Report and Recommendations, the hearing judge, by finding no violation under MRPC 3.1 and MRPC 3.8(a), determined implicitly that insufficient evidence supported Bar Counsel's charge concerning the actual prosecution of the juveniles. Likewise, the hearing judge also implicitly concluded that the evidence did not support a violation of MRPC 8.4(d).

We agree with Judge Stevenson that, based on the evidence presented, Gansler did not commit a violation of MRPC 3.1, MRPC 3.8(a), or MRPC 8.4(d), when he commented on future prosecutions of juveniles who phone bomb threats. Gansler testified and responded to Request for Admissions that he never intended to prosecute any charges in bad faith. Rather, according to Gansler's testimony, by making the comments about prosecuting bomb threats, he intended to communicate that his office must try "hard cases." The hearing judge found this testimony credible, a determination that we readily accept.

Gansler's actual prosecution of the youths also did not amount to a violation of MRPC 3.1, as Bar Counsel contends. Evidence before the hearing judge related to this charge came solely from a newspaper article covering the juveniles' case. The article reported that the District Court judge acquitted the juveniles, stating, "I have no idea who did this" and "I have no evidence." As further reported by the article, the

State's evidence of telephone calls could not link the juveniles to the bomb threat. Without more, the news article does not demonstrate by clear and convincing evidence that Gansler violated MRPC 3.1. Consequently, we overrule Bar Counsel's exceptions to Judge Stevenson's ruling that Gansler's prosecution of the juveniles as well as his reported comments about future prosecutions do not violate MRPC 3.1, MRPC 3.8, or MRPC 8.4(d).

## IV. Sanction

We must determine the appropriate sanction for Gansler's violations of MRPC 3.6 and MRPC 8.4(a). This case marks the first time in Maryland that we have disciplined an attorney for a violation of MRPC 3.6. We remain guided, however, by the well established principles determining the sanction for an attorney who failed to meet our State's standards of professionalism. In sanctioning an attorney, we seek "to protect the public, to deter other lawyers from engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal profession." *Attorney Grievance Comm'n v. Awuah,* 374 Md. 505, 526, 823 A.2d 651, 663 (2003) (quoting *Attorney Grievance Comm'n v. Webster,* 348 Md. 662, 678, 705 A.2d 1135, 1143 (1998)). To protect the public adequately, we impose a sanction that is "commensurate with the nature and gravity of the violations and the intent with which they were committed." *Id.* (quoting *Attorney Grievance Comm'n v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997)). Our sanction, therefore, "depends upon the facts and circumstances of each particular case, including consideration of any mitigating factors." *Id.* (citing *Attorney Grievance Comm'n v. Atkinson,* 357 Md. 646, 656, 745 A.2d 1086, 1092 (2000); *Attorney Grievance Comm'n v. Gavin,* 350 Md. 176, 197–98, 711 A.2d 193, 204 (1998)).

Bar Counsel recommends that we issue a reprimand. On numerous occasions, Gansler spoke outside of court about matters that had a substantial likelihood of depriving several criminal defendants of fair trials. Gansler presented no evidence of mitigating circumstances. The appropriate sanction

in this case is one "which demonstrates to members of this legal profession the type of conduct that will not be tolerated" and which maintains the integrity of the Bar by preventing Gansler's transgressions "from bringing its image into disrepute." *Attorney Grievance Comm'n v. Culver,* 371 Md. 265, 277, 808 A.2d 1251, 1258 (2002) (quoting *Attorney Grievance Comm'n v. Garfield,* 369 Md. 85, 98, 797 A.2d 757, 764 (2002)). A reported reprimand satisfactorily communicates to Gansler and other members of the Bar that improper extrajudicial statements dangerously jeopardize the foundational principles of our system of criminal justice. Accordingly, Gansler is hereby reprimanded.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST DOUGLAS F. GANSLER.*